IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. _____

HARBINGER CAPITAL PARTNERS LLC,
HGW US HOLDING COMPANY LP,
BLUE LINE DZM CORP., and
HARBINGER CAPITAL PARTNERS SP, INC.,

        Plaintiffs,

v.

CHARLES W. ERGEN,
DISH NETWORK CORPORATION,
L-BAND ACQUISITION LLC,
SP SPECIAL OPPORTUNITIES LLC,
SPECIAL OPPORTUNITIES HOLDINGS LLC,
SOUND POINT CAPITAL MANAGEMENT LP, and
STEPHEN KETCHUM,

        Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiffs Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger") for its complaint against Defendants Charles W. Ergen ("Ergen"), Dish Network Corporation ("DISH" and with Ergen, the "DISH Defendants"), L-Band Acquisition LLC ("LBAC"), SP Special Opportunities LLC ("SPSO"), Special Opportunities Holdings LLC ("SO Holdings"), Sound Point Capital Management LP ("Sound Point"), and Stephen Ketchum ("Ketchum," and with Sound Point, the "Sound Point Defendants"), hereby allege as follows:

## PRELIMINARY STATEMENT

1.      This civil racketeering action arises from an illegal scheme involving mail and wire fraud, bankruptcy fraud, tortious interference, and abuse of process by Ergen, his company DISH, and their confederates (collectively, the "RICO Enterprise"), aimed at stripping Harbinger of its valuable contractual rights to control LightSquared and to make critical decisions during LightSquared's Chapter 11 proceedings -- rights that Harbinger acquired pursuant to its multi-billion dollar investment in the company. The RICO Enterprise -- using improper tactics for which Ergen has repeatedly been cited and sanctioned in other cases -- carried out the scheme in an effort, among other things, to enable Ergen, DISH and Enterprise member EchoStar Corporation ("EchoStar") to acquire LightSquared's valuable wireless spectrum assets at fire-sale prices.

2.      By the time the full nature, scope and goal of the RICO Enterprise came to light, it was too late for Harbinger or for the Bankruptcy Court to prevent the loss of Harbinger's rights under its stockholders' agreement with LightSquared (the "Stockholders' Agreement"). This Court (unlike the Bankruptcy Court) has jurisdiction over the claims asserted herein and personal jurisdiction over the key witnesses. Accordingly, Harbinger brings this action for, among other things, violation of the federal Racketeering Influenced and Corrupt Organization Act ("RICO") and the Colorado Organized Crime Control Act ("COCCA"), to recover the damages Harbinger suffered as a result of Defendants' egregious misconduct.

3.      Defendants' conduct was, as the Bankruptcy Court overseeing LightSquared's Chapter 11 cases found, an affront to the Chapter 11 process, in which Defendants abused the bankruptcy proceedings, withheld crucial evidence, and engaged in a "troubling pattern of noncredible testimony." Defendants wrongfully and deceptively created chaos in the bankruptcy proceedings so that Harbinger would lose control of the LightSquared board to which it was

contractually entitled.  That loss of control has already damaged Harbinger significantly.  Ergen and his fellow RICO Enterprise members pursued their abusive scheme through wire, mail and bankruptcy fraud, abuse of process, tortious interference with contract, and obstruction of justice to:  (a) surreptitiously obtain a majority of LightSquared's senior secured debt in breach of the governing credit agreement to gain control in LightSquared's bankruptcy proceeding; (b) make grossly undervalued bids for LightSquared assets to gain the support of the secured creditors it would repay; and then (c) in a ploy to remove the obstacle presented by Harbinger's desire to maximize the value of the estate, misrepresent the adequacy of those bids and charge that by opposing them, Harbinger was breaching its fiduciary duties, when in fact Defendants knew that Harbinger's assessment of LightSquared's value was entirely consistent with valuations they themselves had prepared and later withheld from production.  As a result of the RICO Enterprise's fraudulent conduct, the Bankruptcy Court had no choice but to put in place an independent committee (the "LightSquared Special Committee") to make all of LightSquared's material decisions, thereby stripping Harbinger of its control rights pursuant to the governing Stockholders' Agreement to appoint and remove directors, chair committees, and make key management decisions.

4.     Harbinger is an investment fund that through the years has spent billions of dollars in the development and operation of an innovative satellite-and-terrestrial wireless-services network, through its ownership and unique management rights in LightSquared.  To protect the substantial capital, labor and resources that Harbinger had invested in LightSquared, Harbinger entered into the Stockholders' Agreement with LightSquared and other shareholders.  Under the provisions of the Stockholders' Agreement -- of which Defendants were at all relevant times aware -- Harbinger is afforded expansive protections and management rights with respect

3

to LightSquared, including the ability to appoint and remove a majority of directors and committees, chair all committees, and make material management decisions. These contractual rights -- which provide Harbinger the ability to exercise its control of LightSquared to protect its interests -- represent a significant premium independent of, and incremental to, the value of Harbinger's equity alone.

5.    RICO Enterprise members EchoStar and DISH, led by their Executive Chairman, Ergen, have been on a continuing quest to acquire additional spectrum assets and for years have coveted the spectrum assets held by LightSquared. When in 2012 LightSquared filed for Chapter 11 protection (the "Bankruptcy Proceedings"),[1] Defendants saw their opportunity. As they had done in the past -- including in connection with their acquisition of the wireless assets of DBSD North America Inc. ("DBSD") by using what the Second Circuit concluded to be bad faith debt acquisitions -- Defendants knew that they could use a controlling position in the senior secured debt of LightSquared LP (the "LP Debt") to dominate the Bankruptcy Proceedings and direct a bargain-basement sale of LightSquared's valuable spectrum assets to DISH. They were not deterred by the credit agreement governing the LP Debt (the "Credit Agreement"), which forbade competitors like DISH from acquiring the LP Debt -- in part because Harbinger and LightSquared had feared that competitors, instead of acting as ordinary creditors, would not act in the company's interests but instead do exactly as Defendants planned to do.

6.    Instead, the DISH Defendants knowingly and severally perpetrated the Fraudulent Scheme -- with the substantial assistance of their longtime banker Ketchum and his recently created investment management fund Sound Point -- "to do indirectly what [Ergen] knew was

---

[1]    "Bankruptcy Proceedings" refers to the Chapter 11 cases, captioned *In re LightSquared Inc.*, Bankr. Pet. No. 12-12080-scc (2012).

not permitted directly," as the Bankruptcy Court later concluded, and surreptitiously acquire LP Debt.

7.      In furtherance and on behalf of the RICO Enterprise, Sound Point knowingly created a front, SPSO, and used Ergen's funds to secretly purchase a majority position in the LP Debt that would allow the RICO Enterprise to block Harbinger's control over LightSquared and force a DISH-sponsored bid to acquire LightSquared's assets at a discount and simultaneously repay Ergen at a profit.  With each purchase of LP Debt, Sound Point, on behalf of the RICO Enterprise, fraudulently stated in interstate wire communications that SPSO was not prohibited under the Credit Agreement from purchasing the LP Debt.  The Bankruptcy Court ultimately concluded that Defendants' end run around the transfer restrictions breached the Credit Agreement.

8.      As the RICO Enterprise secretly amassed the LP Debt, Harbinger -- which, as LightSquared's largest equityholder was the constituent most concerned with maximizing the value of the estate -- was seeking to raise financing and directly negotiate a consensual plan of reorganization with creditors that would realize the true value of LightSquared, and thereby allow Harbinger to retain its equity.  In connection with these efforts, Harbinger and LightSquared entered into a so-ordered stipulation with creditors (the "Exclusivity Order") extending the "exclusivity period," or the period in which only LightSquared could propose a plan of reorganization.  The Exclusivity Order required that the creditors engage in good faith negotiations toward a plan of reorganization but contemplated that if these efforts were unsuccessful, LightSquared would have to begin exploring a potential sale of its assets.

9.      To complete its goal of wresting away the valuable wireless spectrum assets held by LightSquared while in bankruptcy, however, the Enterprise first had to strip Harbinger of its

control rights pursuant to the Stockholders' Agreement (the "Fraudulent Scheme").  Concerned that Harbinger would be successful in raising financing sufficient to pay off LightSquared's creditor constituencies thereby avoiding a sale, and desperate to fulfill the Fraudulent Scheme, the RICO Enterprise moved swiftly to remove Harbinger from the equation.  The RICO Enterprise believed that, with Harbinger unable to exercise its control over LightSquared's board to pursue a plan that would maximize the value of LightSquared's estate, LightSquared would cave to the influence of powerful creditor constituencies, now dominated by SPSO, who favored a quick payout over a plan that realized LightSquared's true value.

10.     Thus, on May 15, 2013, purposefully timed to interfere with Harbinger's financing efforts, Ergen, through LBAC, made an unsolicited and nonbinding bid for LightSquared's assets that, while sufficient to pay off in full the holders of LP Debt, including Ergen, was for far less than what Ergen knew to be the true value of the assets, and was a bid Ergen never intended to succeed (the "LBAC Bid").  Defendants then leveraged the influence garnered by their illegal holdings of LP Debt to represent to the Bankruptcy Court and an ad hoc group of lenders collectively possessing a majority of the LP Debt (the "Ad Hoc Secured Group") that the LBAC Bid was fair, and that LightSquared's failure to embrace the grossly inadequate LBAC Bid demonstrated that Harbinger could not discharge its fiduciary duties to LightSquared.  Unbeknownst to the parties and the Bankruptcy Court, however, Defendants were withholding critical documents that conclusively established that Defendants knew full well that the LBAC Bid represented a mere fraction of LightSquared's true value (the "Valuation Materials"), and thus that Harbinger properly had opposed the transaction.

11.     The Ad Hoc Secured Group -- whose financial advisor later testified that absent Defendants' machinations it likely would have reached a consensual plan of reorganization with

Harbinger -- was eager for a quick payoff and quickly embraced the bid and SPSO's efforts, as the RICO Enterprise knew it would. As soon as the exclusivity period ended, the Ad Hoc Secured Group proposed a plan of reorganization (the "Ad Hoc Plan"), placing DISH as the stalking horse bidder committed to purchase LightSquared's spectrum assets for $2.2 billion (the "Stalking Horse Bid"), and requiring the Ad Hoc Secured Group to abandon negotiations for any alternative plan -- even though Defendants secretly planned to cancel that bid and drive the price even lower.

12.     To further ensure the success of a fire sale of LightSquared's assets, however, the RICO Enterprise needed to neutralize Harbinger's influence. Thus, Defendants, now supported by the hoodwinked Ad Hoc Secured Group, forcefully argued that LightSquared could not be trusted to fairly conduct an auction with Harbinger at the helm. Defendants sought to create the impression that Harbinger's interests -- to maximize the estate's distributable value -- conflicted with the estate's interests, which, Defendants asserted, would be served by embracing the Stalking Horse Bid. As Defendants knew, this was false. In fact, as Defendants knew, because Harbinger was seeking to arrange for a plan that realized the actual value of the estate -- which, as Defendants' own Valuation Materials reflect, greatly exceeded the Stalking Horse Bid -- Harbinger's interests were entirely aligned with those of LightSquared.

13.     Based upon Defendants' misrepresentations, the Bankruptcy Court -- without having the benefit of the Valuation Materials -- directed LightSquared to appoint the LightSquared Special Committee to eliminate the purported conflict falsely alleged by Defendants. The LightSquared Special Committee was imbued with complete power over the LightSquared operations that mattered most, including decision making related to a sale or reorganization of LightSquared and actions related to regulatory approval. Directly contravening

Harbinger's rights under the Stockholders' Agreement, the LightSquared Special Committee took steps over the course of the bankruptcy proceeding to depose Harbinger and destroy its authority to appoint and remove directors and make material management decisions.

14.     Unbeknownst to the Ad Hoc Secured Group, however, Ergen never had any intention to purchase LightSquared's assets at even the highly distressed price of the Stalking Horse Bid.  Instead, Defendants meant only to displace Harbinger and thereby force a distressed liquidation in which he could obtain the assets at an even greater discount.  After the LightSquared Special Committee was appointed, LBAC abruptly announced that it was canceling the Stalking Horse Bid, giving a pretextual reason for the cancellation.  In so doing, the RICO Enterprise hoped to further drive down the price of LightSquared's assets by increasing the company's desperation and risk of liquidation.  With plan negotiations in shambles, Defendants still in control of the LP Debt, and LightSquared's quickly evaporating financing pressing it ever closer to the forced liquidation that Defendants had always envisioned, Harbinger resigned from its now worthless board seats to explore alternative ways to salvage its billions in investments in the company.  Had Harbinger known that the Defendants were perpetrating a scheme to displace it from the LightSquared board, it would have taken actions to enforce and protect its rights under the Stockholders' Agreement.

15.     The actions of the RICO Enterprise, in the words of the Bankruptcy Court, breached the "outer limits" of what would be tolerated by a creditor in a bankruptcy.  Moreover, in the course of its scheme, the RICO Enterprise tortiously interfered with Harbinger's rights under the Stockholders' Agreement, committed bankruptcy fraud and abuse of process, and obstructed justice by withholding critical evidence that conclusively established that LightSquared's assets so valuable that Harbinger would have abandoned its fiduciary duties by

*not* opposing the low Stalking Horse Bid. Members of the RICO Enterprise provided false testimony and made numerous misrepresentations, including, as alleged in further detail herein: (a) blatantly misrepresenting that DISH employees were not involved in the purchase of LP Debt, (b) lying to the Bankruptcy Court that the RICO Enterprise had legitimate reasons to leave trades of LP Debt hanging for months when in fact, Defendants were merely seeking to further disrupt negotiations with creditors, (c) misrepresenting the involvement of RICO Enterprise member Sound Point in keeping trades open, (d) misrepresenting to the Bankruptcy Court the value of the LBAC and Stalking Horse Bids, and (e) misrepresenting to the parties and the Bankruptcy Court the reasons for terminating the Stalking Horse Bid.

16. Abusing the judicial process to corrupt the legal rights of others is part of Ergen's *modus vivendi*. He has stated that "[y]ou can live in a bubble, and you're probably not going to get a disease. But you can play in the mud and the dirt, and you're probably not going to get a disease either, because you get immune to it. You pick your poison, and I think we choose to go play in the mud." Thus, Ergen believes that attorneys should figure out "how can I do this, as opposed to what the law says." Practices of the kind Defendants utilized here have led numerous courts in case after case to sanction Ergen's companies for spoliation, contempt, and even perjury.

17. Through this concerted pattern of illegal acts, the RICO Enterprise intentionally and through wrongful means caused Harbinger to lose its rights and LightSquared to breach and render performance impossible under the Stockholders' Agreement. Defendants have also caused Harbinger to incur legal and professional fees in defending against Defendants' illegal conduct in the Bankruptcy Proceeding. Accordingly, Harbinger seeks damages in an amount to be determined at trial, (i) pursuant to the federal and state racketeering statutes predicated on

Defendants' mail and wire fraud, bankruptcy fraud, and obstruction of justice, (ii) for

Defendants' tortious interference with the Stockholders' Agreement, and (iii) for Defendants'

abuse of process.  Harbinger brings its claims before this Court because the majority of the

witnesses are based in Colorado, this Court has jurisdiction over all of the parties and the claims,

and the Bankruptcy Court does not have jurisdiction to hear or issue final orders with respect to

them.  Absent redress by this Court, Defendants' pattern of conduct shows a clear threat of

continuing.

## PARTIES

18.     Plaintiff Harbinger Capital Partners LLC is a Delaware limited liability company

with its principal place of business in New York.

19.     Plaintiff HGW US Holding Company LP is a Delaware limited partnership with

its principal place of business in New York.

20.     Plaintiff Blue Line DZM Corp. is a Delaware corporation with its principal place

of business in New York.

21.     Plaintiff Harbinger Capital Partners SP, Inc. is a Delaware corporation with its

principal place of business in New York.  Together, Harbinger Capital Partners LLC, HGW US

Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. are the

majority shareholders of LightSquared, which, prior to Defendants' misconduct, possessed

expansive management, voting rights, and ability to appoint directors and committee members

pursuant to the Stockholders' Agreement among Harbinger, LightSquared, and other

shareholders.

22.     Defendant Ergen is a natural person and a citizen of the state of Colorado.  Ergen

is the founder, Executive Chairman of the board of directors, majority owner, and an employee

of Defendant DISH and non-party EchoStar.  As of November 30, 2012, Ergen controlled

approximately 88% of DISH's voting shares. Ergen stepped down as the CEO of DISH in 2011 to become the Executive Chairman of DISH in order to focus on "the strategic responsibilities of . . . DISH," such as acquisition and business development. The scheme alleged herein to acquire LightSquared's spectrum by disrupting the Bankruptcy Proceeding fits comfortably within the scope of the "strategic responsibilities" that Ergen has publicly stated are his intent to pursue on behalf of DISH. Through his control of DISH, Ergen also controls Defendant LBAC. Ergen is also the sole member and managing member of SO Holdings, which in turn is the sole member and managing member of SPSO.

23. Defendant DISH is a publicly traded company organized under the laws of Nevada, with its principal place of business in Colorado. DISH is a competitor of LightSquared. It is a provider of broadband and satellite television services and aims to expand its broadband offerings, including by building out an integrated terrestrial network, similar to that which LightSquared intends to offer. Ergen founded DISH in or about 1995 as a service of Ergen-controlled EchoStar Corporation ("EchoStar"), serves on DISH's board of directors as Executive Chairman, and controls a majority of DISH's voting shares. In 2008, DISH was spun off from EchoStar, with EchoStar controlling the technology and infrastructure aspects of the businesses, such as set top boxes and satellite operation, and DISH retaining the pay television business.

24. Defendant LBAC is a limited liability company organized under the laws of Delaware with its principal place of business in Colorado. LBAC was initially formed by Ergen for the sole purpose of bidding on LightSquared's spectrum assets, both through the LBAC Bid and as the stalking horse bidder in the Ad Hoc Plan. LBAC was sold to DISH for $1 shortly after its formation and now is a wholly-owned subsidiary of DISH.

25.     Defendant SPSO is an investment vehicle organized under the laws of Delaware as a limited liability company, with its nominal headquarters in New York and operated by Ergen, directly and through his agents, in Colorado.  SPSO's sole member and manager is SO Holdings, which in turn has Ergen as its sole member and managing member.  SPSO acquired LP Debt on behalf of the DISH Defendants in Colorado.  SPSO was formed by Sound Point on or about May 16, 2012, at Ergen's direction.  SPSO has been acquiring debt in LightSquared since at least April 2012, directly and through its predecessor-in-interest Bal Harbour Capital Management LLC and currently holds over $1 billion of LightSquared's LP Debt.

26.     Defendant SO Holdings is a holding company organized under the laws of Delaware as a limited liability company, with its nominal headquarters in New York, and operated by Ergen, directly and through his agents, in Colorado.  Ergen, who resides in Colorado, is the sole member and managing member of SO Holdings, and SO Holdings in turn is the sole member and manager of SPSO.  Like SPSO, SO Holdings was formed on or about May 16, 2012, at Ergen's direction, by Sound Point.

27.     Defendant Sound Point is an investment management and advisory firm organized under the laws of Delaware as a limited liability company, with its headquarters in New York. Sound Point's founder and managing member is defendant Ketchum.  Sound Point serves as trading manager and investment advisor for SPSO and facilitates and advises SPSO on its investments and investment strategies, as described further herein, in exchange for lucrative fees. Sound Point and Ketchum further provided material advice to the RICO Enterprise regarding acquiring LightSquared's assets, including, upon information and belief, its ability to gain control of the proceeds and depose Harbinger of its contractual rights over LightSquared.  At all times relevant herein, Sound Point transacted business through and within Colorado with

respect to the claims alleged herein for the benefit of the DISH Defendants, which reside in Colorado.

28.     Defendant Ketchum is a natural person and citizen of the state of New York. Ketchum is the founder and managing member of Sound Point, and serves as the trading manager of SPSO.  Ketchum is a former banker to DISH and has a longstanding relationship with Ergen, having worked with DISH and its predecessor, EchoStar, in various capacities since its founding.  Ketchum's work has focused on media and telecommunications at least since 1991. He was the global head of Banc of America Securities LLC's ("Bank of America") Media & Telecom Group, and before that, the head of satellite telecommunications investment banking and a managing director of cable and satellite investment banking at UBS Warburg LLC, and a founding member and a managing director of the Satellite Financing Group for Donaldson Company, Inc.  At all relevant times, Ketchum conducted business through and within Colorado with respect to the claims alleged herein for the benefit of the DISH Defendants, which reside in Colorado, and traveled to Colorado for the purpose of furthering the RICO Enterprise's scheme.

## JURISDICTION AND VENUE

29.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1961 *et seq.* (the "RICO Act") because Plaintiffs' claims arise under the laws of the United States.  Supplemental jurisdiction over the state law claims is proper under 28 U.S.C. § 1367.

30.     The venue of this action is proper in this judicial district pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391, as the District of Colorado is the district where one or more of the Defendants reside and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred, in that Defendants transacted affairs in the District of Colorado and the negotiations and decisions to trade LP Debt, and decisions to make the

LBAC and Stalking Horse Bids, to withhold documents, engage in the Fraudulent Scheme as described herein, and other dealings between the parties named herein occurred within the District of Colorado.  Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965(b) because, to the extent any Defendant may reside outside of this district, the ends of justice require that such Defendant or Defendants be brought before this Court.

31.     This Court has personal jurisdiction over the Defendants pursuant to 18 U.S.C. §§ 1965(a) and (b), as the Defendants reside, have agents and/or transact their affairs in Colorado, and because, to the extent any Defendant does not reside, have agents, or transact its affairs in Colorado, and cannot be served in Colorado, the ends of justice require that such Defendant or Defendants be brought before this Court.  This Court further has personal jurisdiction over the Defendants pursuant to Colo. Rev. Stat. § 13-1-124 because the Defendants, directly or through their agents, transacted business and/or engaged in the commission of tortious acts in the State of Colorado from which the claims alleged herein arise.

## HISTORY OF LITIGATION AMONG THE PARTIES

32.     On August 6, 2013, Harbinger filed its initial complaint, and on September 30, 2013, filed the First Amended Complaint ("FAC") in an adversary proceeding as part of the Bankruptcy Proceeding  ("Adversary Proceeding"),[2] alleging claims against Defendants for equitable disallowance, fraud, tortious interference with prospective economic advantage, tortious interference with the Jefferies[3] relationship, unfair competition, civil conspiracy, disallowance of SPSO's claim under 11 U.S.C. § 502 ("Section 502") of the Bankruptcy Code and aiding and abetting fraud against Sound Point.  The FAC's allegations arise out of

---

[2]        *Harbinger Capital Partners LLC et al v. Ergen et al*, 13-01390-scc (2013).

[3]        "Jefferies" refers to the investment bank Jefferies LLC, and its subsidiaries and affiliates.

Defendants' wrongful actions with respect to the LP Debt that were known as of the date of that filing.

33.    The Bankruptcy Court, in a decision dated November 21, 2013 (the "November Decision")[4] -- not having the benefit of much of the evidence described below, particularly related to the involvement of other DISH employees in SPSO's purchases of the LP Debt and the Sound Point Defendants' involvement in the furtherance and concealment of the scheme -- dismissed Harbinger's FAC, but granted Harbinger leave to replead its Section 502 claim.

34.    The November Decision was primarily premised upon Harbinger's lack of standing to assert the non-Section 502 claims.  The Bankruptcy Court found:  (i) as to the fraud claim, Harbinger was not a party to the Credit Agreement or any of the LP Debt trades such that the Defendants would have a duty to disclose to Harbinger; (ii) as to the aiding and abetting fraud against the Sound Point Defendants, Harbinger did not "allege conduct by the Sound Point Capital Defendants that would constitute 'substantial assistance' in the alleged fraud"; (iii) as to the tortious interference claims, Harbinger did not have "an independent and protectable relationship with LightSquared's creditors or with Jefferies, or a protectable interest in or right to negotiate with LightSquared's creditors' during LightSquared's exclusive periods"; (iv) as to the unfair competition claim, Harbinger did not plead a commercial advantage with respect to the loss of the economic value from its majority equity holdings in LightSquared that resulted from its inability to propose a plan of reorganization within the exclusivity period, particularly where it had proposed a competing plan that would maintain those rights; (v) as to the equitable disallowance claim, such a remedy does not exist as a matter of law under the Bankruptcy Code; and (vi) as to the civil conspiracy claim, it could not survive without the underlying claims.

---

[4]    Citations to the "November Decision" are to the published decision of *In re LightSquared, Inc.*, 504 B.R. 321 (Bankr. S.D.N.Y. 2013).

Although the Bankruptcy Court found Harbinger's claims did not survive for these and other reasons, its decision was rooted in that these claims should be dismissed for lack of standing. Upon its determination that Harbinger, at the time and on those facts, did not have standing, the Bankruptcy Court was without subject matter jurisdiction to decide the remaining aspects of Harbinger's claims, and therefore those findings were all *dicta*.

35.     Defendants have engaged in a continuing series of wrongful acts since the FAC that has resulted in new injuries to Harbinger. At the time of the November Decision, Harbinger had not yet incurred the injuries alleged in this Complaint relating to the complete loss of its rights under the Stockholders' Agreement and those injuries were not a subject of the FAC. Since the November Decision, (i) the Bankruptcy Court has made rulings that have materially modified the November Decision, including with respect to the Sound Point Defendants' culpability and Defendants' liability under the Credit Agreement, (ii) Harbinger has sustained new injuries separate and apart from the injuries suffered by LightSquared as a result of the RICO Enterprise's continuing scheme and violation of the RICO and COCCA statutes, (iii) fraudulently concealed evidence has been discovered that could not have been previously discovered through due diligence, including, for example, the Valuation Materials and evidence concerning the Sound Point Defendants' role in the Fraudulent Scheme, and (iv) Defendants have committed and conspired to commit additional predicate acts in furtherance of their scheme.

36.     On December 2, 2013, Harbinger filed a motion for leave to appeal, arguing that the Court made numerous legal errors in the November Decision. On June 30, 2014, that motion was dismissed as moot with the consent of the parties as a result of the issuance of subsequent decisions by the Bankruptcy Court and appeals therefrom.

37.    On November 15, 2013, LightSquared filed a complaint in intervention ("LightSquared Complaint") in the Adversary Proceeding.  The LightSquared Complaint sought (i) a declaratory judgment that SPSO was not an "Eligible Assignee" under the Credit Agreement; (ii) damages for breach of contract against SPSO; (iii) disallowance of SPSO's claim under Section 502; (iv) equitable disallowance against SPSO; and (v) damages for tortious interference with contractual relations against SPSO, DISH, EchoStar, and Ergen.  The LightSquared Complaint similarly involved Ergen's misconduct in purchasing the LP Debt.

38.    On December 2, 2013, Harbinger filed a limited Second Amended Complaint ("SAC").  The SAC did not assert direct claims in Harbinger's own right.  Rather, it repeated and amplified the allegations in the LightSquared Complaint based on additional discovery and asserted claims of the bankruptcy estate for, among other things, disallowance and equitable subordination of SPSO's claims pursuant to Sections 502 and 510 of the Bankruptcy Code.  The SAC made clear that Harbinger was acting for the benefit of LightSquared's estate and pursuing claims solely on behalf of LightSquared.  The SAC expressly states that it does "not to seek redress for direct harm to itself, but as a party-in-interest in these proceedings, as a secured creditor and the majority equityholder of LightSquared Inc., and an unsecured creditor of LightSquared L.P."

39.    At the December 10, 2013 hearing concerning motions to dismiss the LightSquared Complaint and SAC, the Bankruptcy Court expressly noted that new allegations, relating to DISH Treasurer Kiser's involvement in the LP Debt purchases and SPSO's fault in not closing the trades, "call[ed] out for the development of a factual record."  The Bankruptcy Court specifically asked Defendants whether pleading "[t]hat the treasurer . . . is spending this time executing hundreds of millions of dollars of trades is not something that is different from

what Harbinger pled?" Thus, based on the newly discovered and alleged facts, the Bankruptcy Court permitted Harbinger and LightSquared to pursue claims under Section 502 to benefit LightSquared's estate, and permitted LightSquared to pursue its direct claims for damages based on violations of the Credit Agreement. These holdings were set forth in an order dated December 12, 2013 (the "December Order"). No opinion accompanied the December Order.

40.    In the December Order, the Bankruptcy Court also dismissed Harbinger's claims for declaratory judgment, breach of contract, and equitable disallowance with prejudice, finding again that equitable disallowance was not a viable claim and, with respect to the remainder of the claims, stating that "[t]hese are, in essence, derivative claims" belonging to LightSquared. Harbinger's claim for equitable subordination was dismissed subject to the Bankruptcy Court's reservation of the option to consider it in the context of a plan of reorganization providing for such relief. The only claim in Harbinger's SAC that survived was its claim for legal disallowance under Section 502(b), which Harbinger brought solely for the benefit of LightSquared's estate. Thus, Harbinger's remaining participation in the Adversary Proceeding was solely in the capacity of providing support for LightSquared.

41.    After a seven-day evidentiary trial on LightSquared's claims and the Section 502 claim brought by LightSquared and Harbinger in support of LightSquared's estate, on June 10, 2014, the Court issued its Post-Trial Findings of Fact and Conclusions of Law regarding the Adversary Proceeding (the "June Decision"). The June Decision concluded, *inter alia*, (a) that DISH, EchoStar, Ergen, Sound Point and Ketchum made repeated misrepresentations throughout the Bankruptcy Proceeding, (b) that SPSO's purchases of LP Debt breached the Credit Agreement's implied covenant of good faith and fair dealing, (c) by keeping the LP Debt trades open for no economic reason, the defendants had intentionally interfered with efforts to achieve a

consensual plan of reorganization, and (d) the defendants' actions harmed LightSquared and its

creditors and warranted the equitable subordination of an undetermined amount of SPSO's

claim. The allegations set forth herein concern predicate acts undertaken by the Defendants over

an approximately four-and-a-half-year period. Although some of these predicate acts were the

subject matter of the November and June Decisions, the allegations in Harbinger's FAC and

SAC primarily focused on Defendants' wrongful purchases of the LP Debt.[5] In the FAC,

Harbinger's injuries dealt with its inability to negotiate a plan within the exclusivity period

which expired on July 15, 2013.

42.     Conversely, this Complaint involves damages arising from Defendants'

commission of predicate acts and tortious conduct that Defendants have undertaken both before

and since the dismissal of Harbinger's claims, resulting in new injuries to Harbinger, based on

losing its bargained for rights pursuant to the Stockholders' Agreement to maintain a majority of

LightSquared's board seats -- conduct that was not before the Bankruptcy Court when

Harbinger's claims were dismissed. At no time prior to this Complaint did Harbinger litigate

issues relating to how Defendants' fraudulent scheme injured its property interests in the

Stockholders' Agreement by causing the appointment of the LightSquared Special Committee

and Harbinger's subsequent resignation.

43.     Since Harbinger's direct claims were dismissed, (a) new facts came to light

related to Defendants' misconduct, and in particular the substantial role the Sound Point

Defendants played, and (b) as alleged further herein as the sole basis of Harbinger's present

claims, Harbinger suffered a separate injury when Defendants' misconduct caused it to lose its

contractual rights. Thus, where the FAC sought relief in connection with Harbinger's ability to

---

[5]      While this Complaint includes allegations of predicate acts based on Defendants' conduction in connection
with its LP Debt purchases, it does not seek damages arising therefrom.

propose a plan of reorganization that kept its equity interest intact within the exclusivity period, the current Complaint is limited solely to damages arising from the loss of specific control rights -- including the right to appoint and remove directors, chair committees, and make key management decisions -- pursuant to the Stockholders' Agreement.  Further, the Complaint is separate from the June Decision because the SAC was brought solely to support LightSquared's own claims and for the benefit of the estate and did not seek to redress Harbinger's own injuries that are the subject matter of this Complaint.

### FACTS

44.     Harbinger indirectly owns in excess of 82% of LightSquared, a provider of communications and broadband services, and prior to the injuries complained of herein had exercised its contractual rights under the Stockholders' Agreement, including by appointing a majority of LightSquared's board of directors.

45.     Over the course of many years, Harbinger has invested significant capital and labor to develop, through LightSquared, a unique, next-generation ancillary terrestrial network ("ATC Network") that would employ both satellite service and ground-based antennas to provide nationwide state-of-the-art "4G-LTE" (Fourth Generation -- Long Term Evolution) broadband mobile services.

46.     Under the Stockholders' Agreement among LightSquared and its shareholders, including Harbinger, Harbinger is granted expansive rights with respect to LightSquared -- including voting rights, management rights, and the ability to appoint the majority of directors and chair committees -- that are intended to protect the significant amounts of capital and resources that Harbinger has invested in its position in LightSquared.  Upon information and belief, at all relevant times herein, the Defendants were aware of Harbinger's rights under the Stockholders' Agreement.

20

47.     In particular, the Stockholders' Agreement gives Harbinger the right to elect and remove a majority of the board of directors and committees and to chair all board committees. Specifically, Section 1.1(a) of the Stockholders' Agreement gives Harbinger the right to designate all directors other than the chief executive officer.  Section 1.1(b) provides that "the Stockholders agree to take all actions to provide [Harbinger] with the right and ability at all times to designate a majority of the directors on the Board and each Committee in all cases and any increase of the size of the Board shall increase the number of [Harbinger] Directors accordingly."  Section 1.1(c) requires that "each Committee shall have a[] [Harbinger] Director as its chairperson."  Section 1.1(d) allows for the removal or replacement of Harbinger-appointed directors only by Harbinger.

48.     Additionally, under Section 1.4(b) and Annex A, Harbinger has the right to dictate management decisions with respect to, *inter alia*, "approval of any business plans," "reorganization, recapitalization, reclassification or like transaction," "[l]iquidation, dissolution or winding up," "[a]ny sale, transfer, lease or other disposition by the Company of any assets having a fair market value in excess of $250 million," the making of certain capital expenditures and entering into employment agreements with LightSquared's CEO, CFO or other senior officers.  Further, Section 4.10 forbids LightSquared from entering into any agreement that violates the rights granted to Harbinger.  Finally, under Section 7.16, Harbinger has the right to take action to enforce the terms and provisions of the Stockholders' Agreement in addition to the remedies and relief it is entitled at law or in equity.  These contractual rights to appoint board members and otherwise control LightSquared have value independent of, and incremental to, the value of Harbinger's equity interests.

49.     Relying on the rights it obtained through the Stockholders' Agreement, Harbinger diligently worked with the Federal Communications Commission ("FCC") and other public and federal agencies -- while investing substantial equity and providing hundreds of millions of dollars in debt financing to build out the ATC Network -- to gain authorization to use LightSquared's spectrum for its innovative 4G LTE satellite and terrestrial network.  In 2010, in connection with Harbinger's acquisition of its controlling equity interest in LightSquared, Harbinger entered into an agreement with the FCC to have LightSquared build out the ATC Network and provide coverage to at least 260 million people by the end of 2015 (the "2010 FCC Agreement").

50.     In February 2012, the FCC issued a formal notice (the "FCC Notice") -- contrary to the terms of the 2010 FCC Agreement with Harbinger -- proposing to suspend indefinitely LightSquared's authorization to build out its ATC Network.

51.     On May 14, 2012, LightSquared and several of its affiliates (collectively, the "Debtors") commenced the Bankruptcy Proceeding by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code").  LightSquared continues to operate its businesses and manage its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

52.     Even after the Chapter 11 filing, Harbinger's rights as an equityholder and pursuant to the Stockholders' Agreement, including its ability to appoint LightSquared's directors, persist, and, in many respects, became more important and valuable.

I.     **DEFENDANTS HAVE HAD THEIR SIGHTS ON LIGHTSQUARED'S SPECTRUM ASSETS FOR YEARS.**

A.     **DISH's Past Acquisitions Of Spectrum Assets.**

53.     DISH is a purveyor of satellite television.  Ergen is the founder, Executive Chairman of the boards of directors, an employee, and majority owner, of both DISH and its predecessor and former parent company, EchoStar.  In his role as Executive Chairman, Ergen has been diversifying DISH away from its core Pay-TV business and expanding into the terrestrial wireless business.  Ergen's stated strategic goal is to compete with telecommunications giants, like AT&T and Verizon, which requires a great deal of wireless spectrum.  As Ergen readily acknowledges, spectrum is a scarce and finite resource, with the amount of data flowing over available spectrum doubling every year.  To further its planned move into the wireless space, DISH is desperate to acquire as much spectrum as possible.  To this end, DISH regularly monitors the activities of mobile satellite service ("MSS") companies that hold spectrum, and in particular, DBSD, TerreStar Corp. ("TerreStar"), and LightSquared.

54.     DISH and EchoStar, with Ergen at the helm, for years have been attempting to acquire, or merge with, numerous spectrum-owning companies, including actual and potential transactions involving DBSD, TerreStar, Sirius XM Holdings, Inc. ("Sirius"), Clearwire Corp. ("Clearwire"), Sprint Corp. ("Sprint"), and Inmarsat plc ("Inmarsat").

55.     Ergen is in charge of the strategic direction of DISH and in this capacity has managed the companies' efforts in connection with their mergers and acquisitions.  Substantially assisting Ergen is Jason Kiser ("Kiser"), the Treasurer and a Vice President of DISH, who reports directly to Ergen pursuant to DISH's bylaws and practices.

56.     DISH, at Ergen's direction and with Kiser's assistance, has a history of purchasing distressed or discounted debt of their targets, including acquiring a blocking position

in distressed satellite companies in bankruptcy, such as DBSD and TerreStar, as a step toward acquiring the companies' spectrum assets at a discount.

57.     In DISH's acquisition of TerreStar through bankruptcy, Ergen and DISH employed a three-step strategy -- similar to the strategy employed here for LightSquared.  *First*, EchoStar became the largest secured creditor of TerreStar Networks and the second-biggest shareholder in the parent, TerreStar Corp., to gain influence over the bankruptcy process.  *Second*, DISH became the ultimate purchaser of TerreStar as a stalking horse bidder, repaying EchoStar in its position as a creditor in full.  *Third*, DISH entered into a purchase agreement with TerreStar whereby both the debt-buyer (EchoStar) and the acquirer (DISH) -- both represented by SPSO's counsel in the Bankruptcy Proceeding, Willkie Farr & Gallagher LLP ("Willkie") -- obtained broad releases that ensured EchoStar's claims would be paid in full.

58.     In their acquisition of DBSD, another spectrum-owning company, DISH and Ergen again employed a similar strategy, and flagrantly abused the bankruptcy process by engaging in a fraudulent scheme through the use of the wires to further their acquisition.  The Second Circuit, in explaining DISH's scheme, stated:  "DISH, as an indirect competitor of [the lead debtor] and part-owner of a direct competitor, bought a blocking position in (and in fact the entirety of) a class of claims, after a plan had been proposed, with the intention not to maximize its return on the debt but to enter a strategic transaction with [the lead debtor] and 'to use [its] status as a creditor to provide advantages over proposing a plan as an outsider, or making a traditional bid for the company or its assets.'"  *In re DBSD North America, Inc*., 634 F.3d 79, 104 (2d Cir. 2011) (citation omitted).  Upon information and belief, after acquiring DBSD's debt, Colorado-based DISH, through the use of the wires, and foreseeing that the wires would be used in furtherance of its scheme, directed its counsel in New York to seek to terminate the

exclusivity period as quickly as possible in order to force a sale, just as Defendants did here. Then, in or around August 2009, DISH again instructed its counsel via the wires to vote its wrongly obtained holdings against the plan, in what the Second Circuit ultimately concluded was part of a bad faith scheme to acquire DBSD's property.

59.     The Second Circuit, in affirming the bankruptcy court's finding that DISH acted in bad faith and its designation of DISH's vote in DBSD's bankruptcy proceeding, concluded that "DISH purchased the claims as votes it could use as levers to bend the bankruptcy process toward its own strategic objective of acquiring DBSD's spectrum rights, not protecting its claim." *Id.* This is strikingly similar to how the Bankruptcy Court explained Defendants' conduct in the Adversary Proceeding, when it stated that Defendants' "purchase of LP debt in order to preserve a strategic option for the benefit of DISH, a disqualified company, violated the spirit of the credit agreement's restrictions on competitors owning LP debt," and characterized Defendants' actions as "inequitable conduct sufficient to warrant equitable subordination of the SPSO claim." In DBSD, like here, DISH's ultimate goal was to "control the bankruptcy process for this potentially strategic asset." *Id.*

60.     As a result of these tactics, in March 2012, DISH gained control of DBSD and TerreStar's spectrum, now known as AWS-4 spectrum, which, as of at least January 17, 2014, DISH has still not deployed. As DISH has itself acknowledged, it is not content with the spectrum it currently owns and continues to pursue additional spectrum assets.

61.     More recently, Ergen set his sights on acquiring the assets of Clearwire Corporation after it had entered into a merger agreement with Sprint. By use of the wires, Ergen caused DISH to make a tender offer for Clearwire's stock, which violated the shareholder rights of Sprint and other equityholders and tortiously interfered with the pending merger agreement.

According to a complaint Sprint filed against DISH at the time, DISH duped Clearwire's minority shareholders into believing that DISH would pay them a higher price for their stock than they would receive through a Sprint merger in an effort to cause the minority shareholders to vote against the Sprint merger or create the perception that the merger could be defeated. DISH made a series of non-binding or otherwise unactionable offers for Clearwire's minority shares which allegedly were conditioned on untenable terms that would induce breaches of Clearwire's existing agreements. Soon after Sprint sued for this misconduct, DISH withdrew its misleading tender offer.

## II. DEFENDANTS DEVISE A SCHEME TO ILLEGALLY PURCHASE THE LP DEBT AND TAKE OVER LIGHTSQUARED.

### A. Ergen, Kiser, And Ketchum Investigate Whether DISH Or EchoStar Can Directly Purchase The LP Debt, And Determine That Neither Company Can Purchase LP Debt.

62. At the center of the RICO Enterprise was Ergen, who perpetrated the Fraudulent Scheme to strip Harbinger of its rights under the Shareholders' Agreement and acquire LightSquared's assets with the substantial assistance of DISH's Treasurer and Vice President of DISH and EchoStar, Kiser, his long-time banker, Ketchum, and Ketchum's firm, Sound Point.

63. In the fall of 2011, Ergen considered, for at least the second time, an acquisition of LightSquared.[6] Ergen believed that LightSquared's spectrum was very similar to DBSD and TerreStar's spectrum and therefore could fit with DISH's existing spectrum in the long-term. As a means to acquiring these assets, Ergen sought to repeat his DBSD and TerreStar strategy and began looking into acquiring LightSquared's LP Debt. In the period beginning in at least as early as February 2012, DISH's Vice President of Corporate Development, Thomas Cullen, continually emailed Ergen and Kiser news of LightSquared and its progress toward bankruptcy.

---

[6] Years earlier, EchoStar had been interested in LightSquared's predecessor company, SkyTerra.

At or around that time, Ergen asked Kiser to provide him with information concerning a potential purchase by DISH of the LP Debt. Kiser, acting as an agent of DISH, compiled information for Ergen on LightSquared's spectrum and capital structure to pass on to Ergen.

64.     In April 2012, Kiser and Ergen retained Sound Point to facilitate purchases of the LP Debt and asked Sound Point's founder, Ketchum -- a long-standing investment banker for Ergen's companies, who had worked with Kiser for over twenty years on DISH-related transactions -- if DISH was permitted to purchase the LP Debt. Ketchum had formed the asset management company Sound Point in 2009 after being fired from Bank of America. Ketchum was desperate for Ergen's potentially extremely profitable business and viewed this as a first step in the relationship. Indeed, SPSO's ultimate purchases of the LP Debt resulted in a significant increase in Sound Point's assets under management. At the time that it was retained, Sound Point understood that the LP Debt purchases were part of a "loan-to-own" scheme.

65.     In 2011, Ergen first set out to determine whether his companies, DISH or EchoStar could purchase the LP Debt based on the provisions of the governing Credit Agreement. As Defendants learned, the Credit Agreement contains transfer restriction provisions clearly intended to exclude LightSquared's competitors from entering its capital structure (the "Transfer Restrictions"). Specifically, Section 10.04(b) of the Credit Agreement provides that a "Lender" -- or holder of LP Debt -- can only "assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement." (Credit Agreement § 10.04(b).) The Credit Agreement proscribes that an "Eligible Assignee" "shall not include . . . any natural person or any Disqualified Company," with "Disqualified Company" defined as "any operating company which is a direct competitor of [LightSquared]" that is designated as such, as well as "any known subsidiary thereof." (Credit Agreement, § 1.01.) The

27

designated Disqualified Companies include both EchoStar (designated in the original Credit Agreement) and DISH (designated by amendment on May 9, 2012). Thus, under the unequivocal terms of the Credit Agreement, both EchoStar and DISH are barred from purchasing LP Debt.

66.     Companies commonly restrict competitors from purchasing their debt because competitors -- like DISH here -- would not be interested in maximizing value for the debtor company, but instead would have the incentive to diminish the estate's value as an adversary and possibly to purchase the debtor's valuable assets at the lowest possible price. A competitor in a debtors' capital structure would have a natural incentive to derail any viable reorganization plan that ensures the debtor's survival and competitive strength, and may use its role as a creditor to access non-public information about the debtor's business for its competitive advantage. Indeed, under the Credit Agreement, LP Debt holders are entitled to receive substantial non-public information about LightSquared and are granted access to LightSquared's officers, agents, and employees who are compelled to provide them sensitive information regarding LightSquared's ongoing business and operations. (Credit Agreement, §§ 3.04-3.09; 5.01(a)-(b), (h), (j); 5.07(a); 10.01(d).) Therefore, competitors holding LP Debt would be able to obtain sensitive non-public information related to LightSquared's operations.

67.     On behalf of the RICO Enterprise, both Ketchum and Kiser, upon consultation with Sullivan and Cromwell LLP ("S&C"), DISH's outside securities counsel, determined that under the Credit Agreement DISH and EchoStar were restricted from buying the LP Debt. Upon consultation with S&C, Kiser also concluded that Ergen could not buy the LP Debt personally, because he was a "natural person," barred from buying the LP Debt under the Credit Agreement.

Thus, at all relevant times the RICO Enterprise was aware that DISH and EchoStar were barred from purchasing the LP Debt.

      **B.     Ergen And Kiser, Through The Sound Point Defendants, Create Fronts To Evade The Credit Agreement's Transfer Restrictions.**

      68.    After learning that DISH, EchoStar and Ergen were restricted under the Credit Agreement from purchasing LP Debt, Ergen and Kiser nevertheless decided to create a special purpose vehicle ("SPV") to serve as front to surreptitiously purchase the LP Debt. In the Bankruptcy Court's words, it was "important" to the DISH Defendants and Sound Point Defendants "that the public not know that they were behind Sound Point's purchases." Although Ergen used his own personal funds to purchase the LP Debt, he did so knowing, upon information and belief, that he could at any time force DISH to purchase the assets in an amount that would repay him at a profit. Thus, the Bankruptcy Court found that the Defendants sought to "undercut what Mr. Ergen certainly knew the restrictions were designed to prevent," and "to do indirectly what he knew was not permitted directly," thereby breaching the implied covenant of good faith and fair dealing in the Credit Agreement.

      69.    To surreptitiously purchase the LP Debt for the benefit of DISH, on December 21, 2011, Ketchum and Sound Point set up Bal Harbour Capital Management LC ("Bal Harbour Capital") and its sole managing member and holding company, Bal Harbour Holdings, LLC ("Bal Harbour Holdings," and together with Bal Harbour Capital, "Bal Harbour"), so that Ergen could begin to purchase LP Debt without alerting UBS AG Stamford Branch ("UBS"), the administrative agent under the Credit Agreement, LightSquared or Harbinger that it was not an "Eligible Assignee." However, after forming Bal Harbour, Kiser realized that the Colorado address on the formation documents might lead the public back to DISH and Ergen, both based in Colorado, as the source of the purchases. Kiser therefore directed Sound Point to create new

SPVs without the Colorado address to replace Bal Harbour.  On May 11, 2012, Ketchum proposed to Kiser that the new entity's name be SP Special Opportunities, LLC -- a name, which as the Bankruptcy Court found, "suggest[ed] Sound Point ownership."

70.     Each of the entities that Ergen created -- Bal Harbour, SO Holdings and SPSO -- were thinly capitalized instrumentalities used for the sole purpose of acquiring the LP Debt. Sound Point nevertheless traded on behalf of Ergen's minimally-funded fronts between April 2012 and April 2013 because, as the Bankruptcy Court found, Ketchum understood that SPSO was "identical to Mr. Ergen," whom Ketchum knew to have the money to stand behind the trades.

### C.      The RICO Enterprise Secretly And Fraudulently Purchases The LP Debt.

71.     Defendants were fully aware of the Transfer Restrictions in the Credit Agreement, and knew that SPSO was purchasing the LP Debt for the benefit of DISH, as a competitor of LightSquared.  Nevertheless, between April 13, 2012 and April 26, 2013, RICO Enterprise members Ergen, Kiser, SPSO, Ketchum, and Sound Point contracted to purchase over $1 billion in par value of LP Debt, initially through Bal Harbour, and, later, through SPSO.  Of this amount, only $844,323,097.83 in par value actually closed.  All of the LP Debt trades were settled through SPSO.

72.     In purchasing the LP Debt, Defendants engaged in a pattern of deception using interstate wires.  With each purchase, Sound Point in New York, at the direction of Ergen and Kiser in Colorado, was required to deliver to administrative agent UBS in Stamford, Connecticut an "Assignment and Assumption" agreement and "Administrative Questionnaire" (collectively, the "Purchase Documentation"), pursuant to and incorporated by reference into the Credit Agreement.  The Defendants represented in the Purchase Documentation for each purchase that SPSO meets the requirements of an Eligible Assignee, in an attempted end-run around the

restrictions of the Credit Agreement, and in breach of the implied covenant of good faith and fair dealing. Under the Credit Agreement, any information furnished by SPSO in connection with the Purchase Documentation could neither contain any material misstatement of fact nor omit any material fact necessary to make the statements therein not misleading. (Credit Agreement § 3.14.) UBS could only approve the transfer of LP Debt to an Eligible Assignee with properly executed Purchase Documentation, and thus UBS acted in a non-discretionary capacity as a gatekeeper to LightSquared's capital structure on LightSquared and Harbinger's behalf.

73. Pursuant to the Credit Agreement, UBS -- acting explicitly for these purposes "as an agent of Borrower" -- accepted the Purchase Documentation and, based on the information therein, recorded on a register ("Register") the names and addresses of each Lender, including SPSO, and its interest in the LP Debt. (*Id.* § 10.04(b), 10.04(c).) It was imperative to Harbinger and LightSquared that they know at all times the true identity of the Lenders holding LightSquared's LP Debt and that such investors were Eligible Assignees. Therefore, UBS created a list of LP Debt holders and their interests in the LP Debt based ("Lender List"), which it provided to LightSquared from time to time. LightSquared in turn sent the Lender List to Harbinger. Harbinger vigilantly monitored the Register and Lender list.

74. Upon information and belief, Defendants knew LightSquared and its largest shareholder, Harbinger, had access to the Register and the information contained therein. Thus, in connection with each purchase of the LP Debt, Sound Point in New York -- acting on behalf of SPSO and SO Holdings and for the benefit of the DISH Defendants in Colorado -- transmitted via the wires, representations in the Purchase Documentation to UBS in Connecticut, that SPSO was an Eligible Assignee to deceive LightSquared and Harbinger into believing the purchases were legal and to conceal SPSO's true identity in furtherance of the Fraudulent Scheme.

Moreover, in the Purchase Documentation, the Enterprise specifically designated a contact person at Sound Point to receive the confidential information to which LP Lenders were entitled under the Credit Agreement.

75.     Even beyond the misleading statements in the Purchase Documentation, Defendants went to great lengths to conceal their scheme and SPSO's true ownership from Harbinger and LightSquared.  For example, on May 2, 2012, Ketchum advised a Sound Point employee to make certain trades through Seaport Capital ("Seaport") -- a "riskless principal" that acted as middleman -- to "protect [the] identity of the buyer."  A few days later on May 5, 2012, Ketchum emailed Kiser alerting him of inquiries from the press and informing Kiser that he "obviously" would not reply.  Similarly, on May 7, 2012, after receiving a press inquiry, Ketchum reached out to Kiser and asked whether they should "employ a more strenuous strategy around" denying that Ergen was behind SPSO to the press.  Indeed, Sound Point was not even willing to disclose the identity of SPSO to a middleman who offered to create an ethical wall to prevent a possible leak of information.

### D.     Defendants Orchestrated The Purchases Of The LP Debt To Seize LightSquared's Spectrum Assets.

76.     From the outset of Ergen's interest in LightSquared, and at all times throughout the Bankruptcy Proceeding, the RICO Enterprise's strategy in acquiring the LP Debt was *first*, to ensure that LightSquared would go into bankruptcy, *second*, to remove Harbinger from controlling LightSquared to ensure a fire sale of LightSquared, and *third*, to purchase LP Debt in an amount necessary to establish a blocking position to obtain leverage in the Bankruptcy Proceeding such that the spectrum assets could be purchased for DISH.

77.     In early 2012, Ergen and Kiser knew that there was a strong possibility that LightSquared would file for bankruptcy, in part because other DISH employees and Sound Point

closely monitored LightSquared's progress and communicated that information to Ergen and Kiser. Indeed, Defendants actively took steps to force LightSquared's bankruptcy filing. On May 4, 2012, the seller in a trade of LP Debt that SPSO had entered into, but not yet closed asked SPSO, through Sound Point, whether SPSO would vote to approve an amendment that would give LightSquared a one-week extension to continue negotiations with creditors and potentially forestall a bankruptcy filing. Kiser relayed the request to Ergen the same day, explaining that the seller was inclined to approve the extension. Sound Point offered to provide additional information about the terms of the extension, but Ergen simply directed to "have them vote no," which Kiser conveyed to Ketchum the same day. When Kiser reported the decision, Ketchum stated internally within Sound Point that it was "[n]o surprise" that they would favor bankruptcy, because the RICO Enterprise's plan was for LightSquared to enter bankruptcy.

78. Ergen falsely testified under oath in the Adversary Proceeding that he "voted no" because he did not have the documents necessary to decide how to vote. But, as the Bankruptcy Court found, Ergen made no attempt to obtain this documentation and Sound Point offered to provide the documents to Kiser. Kiser also conceded that before voting no as per Ergen's directive, he made no effort to discuss with any of the LP Debt holders why they wanted to extend the default deadline. As the Bankruptcy Court commented, *"[t]hat Messrs. Kiser and Ergen failed to testify truthfully about the reasons for the no vote is significant . . . and is part of a troubling pattern of noncredible testimony."* (Emphasis added.)

79. Once LightSquared filed for Chapter 11 protection, the RICO Enterprise began implementing the next step of their scheme: obtain at least 33% of the LP Debt -- known as a blocking position -- that would allow it to gain control of the Bankruptcy Proceeding and position DISH as the stalking horse bidder for LightSquared's assets. A few months after

LightSquared's May 14, 2012 bankruptcy filing, on October 4, 2012, Ergen, aware of the significance of a blocking position, instructed Kiser that "[i]f we can't be sure [DISH] can buy [the LP Debt], then I am interested to increase my position at the 75 [cents to the dollar] level at least up to a 33% ownership level of the class." Sound Point, at Kiser's direction, thereafter regularly tracked SPSO's ownership to see how close SPSO was to reaching its goal. The Bankruptcy Court thus found that by at least as early as October 4, 2012, "the preferred purchaser of the LP Debt was DISH."

80.     The RICO Enterprise was clear that their LP Debt purchases were directed toward an ultimate acquisition of LightSquared's assets for the benefit of DISH. To achieve a blocking position, and acting inconsistently with the behavior of a creditor seeking to maximize its return, SPSO was willing to pay close to par for the LP Debt. The Bankruptcy Court found that "Mr. Ergen's substantial near par purchases of LP debt in April 2013 are consistent with a plan to obtain a blocking position in order to acquire the underlying company."

81.     Additionally, from the outset, Ketchum described the RICO Enterprise's initial SPV, Bal Harbour, set up in 2011, as "focused primarily on . . . loan-to-own situations," or a situation in which the purchaser expects the credit to be exchanged into equity. On March 28, 2013, when the RICO Enterprise believed it had achieved a blocking position by purchasing a bundled trade of LP Debt and LightSquared LP preferred stock, Ketchum warned his colleague that "[t]here may be a bunch of press since we now control the company" and congratulated Kiser for their scheme coming to fruition, saying, "You just bought a spectrum company." In fact, SPSO went on to acquire more than fifty percent of the LP Debt, leading the Bankruptcy Court to comment that purchases "achieved by indirection, something that it could not have achieved directly -- the creation of leverage for DISH to acquire LightSquared's assets."

82.     Upon information and belief, Sound Point and Ketchum were in an agreement with Ergen, SPSO and Kiser, as DISH and EchoStar's agent, to play a critical role in the Fraudulent Scheme, and they knew the Fraudulent Scheme could not be secretly carried out without their assistance.  Sound Point and Ketchum knew, among other things, that:  the Credit Agreement prohibited purchases of the LP Debt by DISH; that the purchases were part of a "loan-to-own" scheme for DISH to acquire LightSquared's assets; that the purchases were made to benefit DISH (which Ketchum sometimes referred to as "EchoStar"); that the trades were being directed by agents of DISH and EchoStar; and that Bal Harbour and SPSO were owned and controlled by DISH's Executive Chairman, Ergen.  In furtherance of the Fraudulent Scheme, Sound Point and Ketchum, among other things: helped create straw-man companies to mask DISH's involvement in the purchase of the LP Debt; conferred with DISH's Treasurer and EchoStar's Vice President on trading strategy; represented in purchase documentation that SPSO was an "Eligible Assignee"; identified counterparties and executed trades; worked to conceal the involvement of DISH and Ergen in the trades; monitored whether SPSO had obtained the blocking position that was critical to the acquisition plan; intentionally hung trades to interfere with the bankruptcy proceedings and Harbinger's critical negotiations to reach a plan of reorganization; advised the RICO Enterprise on matters related to the bids; and Ketchum repeatedly gave false testimony in the Adversary Proceeding in order to mask and further the interests of the Enterprise.

> **E.     DISH's Board Members And Senior Management Tacitly Approved Of, And Were Complicit In, Ergen's Illegal Acquisition Of The LP Debt.**

83.     Kiser was not the only DISH and EchoStar senior executive that was complicit in the Fraudulent Scheme.  DISH's board members and management facilitated and tacitly approved the RICO Enterprise's scheme to obtain LightSquared's assets, which were ultimately

for their benefit. Prior to and throughout the period Ergen and Kiser were amassing a substantial position in the LP Debt, the RICO Enterprise members used DISH's offices, email, phone lines, employees, counsel and outside investment bankers to carry out the LP Debt trades. SPSO went so far as to use DISH's address as its own in a Trading Management Agreement with Sound Point and in correspondence with Sound Point.

84.     In May 2012, when news reports began speculating that Ergen might be behind Sound Point's purchases of LP Debt, the DISH board members and management remained silent, despite the fiduciary obligations they owed to determine whether a corporate opportunity was being usurped. The limited inquiries that they did make were met with vague answers or obfuscation. For example, in response to inquiries from a DISH board member about whether Ergen was buying the LP Debt, DISH's general counsel merely replied misleadingly that "*[t]he company* did not buy any LightSquared bonds" -- without explaining that Ergen himself was buying it up on DISH's behalf. (Emphasis added.) When directly questioned by DISH executives about his purchases of the LP Debt, Ergen gave the same refrain that there "might be some truth" to the rumors.

85.     Moreover, the evidence reflects that numerous officers and directors were in fact aware of the truth, but, as the Bankruptcy Court remarked, the evidence "reveal[s] a striking lack of candor between Mr. Ergen and members of DISH's board of directors and senior management. In addition to demonstrating that Mr. Ergen directed the actions of the DISH Board, as stated by one of its members, the inquiries (or lack thereof) posed to Mr. Ergen also suggest that the DISH Board and senior executives may have been unconcerned about Mr. Ergen's personal LightSquared debt purchases (and later, his LBAC Bid) because they had confidence that his strategy would inure to the benefit of DISH."

### III. THE RICO ENTERPRISE SEEKS TO DISLODGE HARBINGER FROM ITS CONTROL OF LIGHTSQUARED BY MAKING A LOW-BALL BID TO CREATE A FALSE CONFLICT.

86. Having secretly obtained a blocking position in the LP Debt through front-company SPSO, the RICO Enterprise -- with material advice and assistance from their investment advisors, the Sound Point Defendants -- shifted to the next part of the Fraudulent Scheme: sever Harbinger -- which as the majority equityholder was the only significant party with an incentive to maximize the value of LightSquared -- from its corporate governance rights over LightSquared so that it would be unable to make critical decisions about LightSquared during the Bankruptcy Proceeding. By displacing Harbinger and its control over the LightSquared board, Harbinger would no longer be in a position to protect its interests in the Bankruptcy Proceedings where secured creditors -- like SPSO -- had substantial rights. Defendants were keenly aware of these rights, and indeed had continually and ineffectively, made false claims to the Bankruptcy Court that Harbinger was exercising its rights to the detriment of LightSquared. However, because Harbinger's interest in maximizing the value available to the estate coincided with the interests of LightSquared, its complaints had fallen on deaf ears. As Harbinger began progressing in its negotiations with LightSquared's creditors for a full-pay plan allowing it to retain its equity interest and avert a sale of LightSquared's assets, Defendants became increasingly nervous and saw Harbinger as an impediment to accomplishing its Fraudulent Scheme. Thus, Defendants formed a plan to overcome their obstacles and remove Harbinger from LightSquared's board to acquire LightSquared's assets without objection.

87. DISH and Ergen acted quickly to make the low-ball LBAC Bid in May 2013 of $2 billion for LightSquared's assets. To garner the support of the Ad Hoc Secured Group, Defendants made the LBAC Bid (which subsequently became the marginally increased $2.2 billion Stalking Horse Bid that was the centerpiece of the Ad Hoc Plan filed in July 2013) at just

the amount necessary to satisfy the claims of the LP Debt holders, including the Ad Hoc Secured Group and Ergen himself.

88.     The Defendants knew full well that the bids represented a mere fraction of LightSquared's true value, but nonetheless through repeated and foreseeable use of the mail and wires, led the Bankruptcy Court and the Ad Hoc Secured Group to believe that their bids were fair and that LightSquared's failure to jump at the bids demonstrated LightSquared's lack of independence from Harbinger. Indeed, DISH and Ergen had performed valuations, which they concealed during the Adversary Proceeding, that placed a value of LightSquared's spectrum assets to DISH in excess of $7 billion. However, without the benefit of the Valuation Materials establishing Defendants' own high valuation of LightSquared, the Ad Hoc Secured Group and the Bankruptcy Court adopted Defendants' position and forced LightSquared to appoint the LightSquared Special Committee to consider accepting the grossly inadequate Stalking Horse Bid.

89.     Under the terms of its appointment and the Court's orders, the LightSquared Special Committee was invested with total power over issues related to reorganization -- the only issues that truly mattered then for LightSquared -- stripping the value from Harbinger's contractual control rights and leaving Harbinger impotent to affect the direction of the Bankruptcy Proceedings or protect its interests by maximizing the value of the estate. Indeed, Harbinger's power was usurped so much by the LightSquared Special Committee that it ultimately resigned from LightSquared's board.

90.     Nevertheless -- despite the Bankruptcy Court's concerns, and as Defendants knew -- the LBAC and Stalking Horse Bids did not create a conflict between the interests of

LightSquared's estate and Harbinger because it was too low to warrant serious consideration by LightSquared.

      **A.**      **Harbinger Progresses Toward A Consensual Plan Of Reorganization.**

      91.      On February 13, 2013 -- after months of negotiations between Harbinger, LightSquared and the Ad Hoc Secured Group to extend LightSquared's exclusivity period -- the Bankruptcy Court entered the Exclusivity Order extending LightSquared's exclusivity period to July 15, 2013. The Exclusivity Order required the parties to engage in good faith negotiations regarding the terms of a consensual Chapter 11 plan and stated that if a consensual plan was not reached by July 15, a sales process of LightSquared's assets would ensue. The Exclusivity Order also provided that it could be terminated if the Ad Hoc Secured Group, collectively, ceased to be the largest holders of the LP Debt.

      92.      Between April and May 2013, prior to Ergen submitting the LBAC Bid for LightSquared's assets, the Ad Hoc Secured Group, Harbinger and LightSquared worked towards a plan of reorganization of LightSquared that avoided a sale of its assets and exchanged term sheets reflecting those negotiations. One term sheet contemplated a plan in which all creditors and preferred equity classes would receive a full recovery and LightSquared would emerge from bankruptcy with Harbinger's equity interest intact. A subsequent term sheet provided for a LightSquared reorganization in which Harbinger and/or LightSquared would obtain an infusion of new capital.

      93.      A critical part of Harbinger and LightSquared's negotiations with the Ad Hoc Secured Group was to obtain, prior to the expiration of the Exclusivity Period on July 15, 2013, a commitment for exit financing in an amount sufficient to satisfy the Ad Hoc Secured Group's claims in full. To that end, Harbinger negotiated and supported LightSquared's retention of Jefferies to secure a senior secured term loan for LightSquared that would repay all of

LightSquared's creditors in full and leave Harbinger's controlling equity interest intact (the "Exit Loan"). Harbinger even agreed to pay fees associated with the Exit Loan financing, anticipated to be up to approximately $80 million. Jefferies expressly confirmed that it was "highly confident" it could raise the full amount of the Exit Loan. Although that commitment was subject to a number of conditions, as is customary in any commercial financing transaction, it is highly likely that those conditions would have been satisfied and the financing achieved absent Defendants' interference. On June 7, 2013, the Bankruptcy Court authorized Jefferies to act as the sole manager and placement agent or arranger for the Exit Loan.

**B.      Ergen Submits A Low-Ball Bid To Usurp Harbinger's Rights In LightSquared Under The Stockholders' Agreement.**

94.     Knowing that it was essential to remove Harbinger from its control of LightSquared's board so that Harbinger could not obtain an Exit Loan, reach a consensual plan, or continue to pursue plans that would avoid a sale or drive up the price of LightSquared's assets in accordance with their true value, Defendants had to act quickly. Defendants knew that with Harbinger in control of LightSquared it would not accept their fire-sale bids, and instead fight to maximize the value of the estates for all of the stakeholders. Therefore Defendants hatched a plan to make a bid for LightSquared's assets for an amount they knew that the LP Debt holders would embrace but that Harbinger, aware of the true value of LightSquared's assets, would reject, thereby driving a wedge between Harbinger and the secured creditors, and allowing them to manufacture a false conflict of interest.

95.     Acting quickly, in April 2013, SPSO engaged Willkie as its bankruptcy counsel, which, as Ergen testified, was done in order to pursue LightSquared's assets. Then, on May 2, 2013, Ergen made a presentation to DISH's board, officially presenting it with information about the LightSquared LP Debt purchases and proposing that DISH acquire LightSquared's assets for

$2 to $2.1 billion (the "Ergen Presentation"). The Ergen Presentation to the board reiterated that "[Ergen's] substantial interests in L2 debt and preferred stock compliment any acquisition strategy and could have significant influence in L2's chapter 11 cases." Ergen believed that DISH's immediate adoption of his plan was a foregone conclusion, proposing: (i) an immediate bid accepted by May 15, 2013 "before [LightSquared's] marketing process get[s] underway," -- *i.e.*, before Harbinger raised exit financing; (ii) execution of the purchase agreement by May 31; and (iii) early funding on August 15.

96.     As part of the RICO Enterprise's scheme, on May 15, 2013, Willkie submitted the LBAC Bid for LightSquared's spectrum for $2 billion on behalf of the yet unformed LBAC, owned by Ergen.[7] A key feature of the illusory LBAC Bid -- which was non-binding and expired within a mere two weeks on May 31, 2013 -- was LBAC's apparent "willingness to fund the Purchase Prices [of $2 billion], on a non-refundable basis," prior to regulatory approval. The LBAC Bid was intentionally set at $2 billion to garner serious consideration by the Ad Hoc Secured Group even though Ergen never intended for the bid to succeed. The LBAC Bid, which expressly stated the buyer of the LightSquared assets would be "owned by one or more of Charles Ergen, affiliated companies and/or other third parties," was meant to be adopted by DISH or EchoStar. While Ergen testified that he made the LBAC Bid as a personal investment, the Bankruptcy Court found this contention was "not credible."

97.     Although the bid was marked "confidential," Defendants, upon information and belief, immediately leaked it to the press with the goal of further disrupting Harbinger's capital raise, sowing confusion and doubt among potential investors as to whether the spectrum assets had sufficient value to serve as adequate collateral for raising exit financing or other investment

---

[7]     LBAC did not exist at the time the offer was made and was not formed until six weeks later, on May 28, 2013.

capital. Upon information and belief, members of DISH in Colorado leaked the LBAC Bid via the wires to *Bloomberg*, *Reuters*, and *Wall Street Journal* reporters based in New York.

98. Ergen, however, had no intention to ever consummate the LBAC Bid. Rather, the LBAC Bid was intended to drive a wedge between Harbinger and LightSquared before Harbinger's "marketing process [*i.e.* financing] was underway."

### C. Ergen Causes DISH To Adopt The Bid.

99. As the Bankruptcy Court found, Ergen had no intention of purchasing LightSquared's assets on his own, but took action to cause DISH to adopt his bid for LightSquared's assets. However, on May 8, 2013, unbeknownst to Ergen, DISH's board passed a resolution forming a special committee consisting of the two directors purportedly independent of Ergen tasked with examining the propriety of Ergen's purchases of the LP Debt and the prospect of a DISH bid for LightSquared's assets ("DISH's Special Committee").

100. When Ergen initially learned about the formation of DISH's Special Committee, he was livid, and objected to their engagement of professionals. However, months later when Ergen became increasingly afraid that his opportunity would be lost -- believing that LightSquared was "going to get [the financing] done," he began pushing DISH's Special Committee. Thus, the Bankruptcy Court concluded that "[d]espite being in existence for three months, the special committee was forced to work under a compressed timetable because of Mr. Ergen's interference with their ability to begin their task."

101. Under these intense time pressures, on July 21, 2013, DISH's Special Committee presented its conclusions to the board, recommending that DISH pursue the LBAC Bid for $2.2 billion, but subject to five express conditions, four of which necessitated further review and decision making by the Special Committee. Immediately after DISH's Special Committee delivered its conditional approval, however, the DISH board abruptly disbanded DISH's Special

Committee without advance notice. DISH's Special Committee was disbanded despite the fact that the conditions had not been satisfied and that the resolutions creating it only allowed it to disband *itself* while a bid remained viable. Thus, as the Bankruptcy Court put it, DISH's Special Committee was "little more than window dressing" and Ergen's "bullying," made it "clear that Mr. Ergen believed that after making the LBAC bid he could and would get DISH to step in as purchaser."

102. On July 23, 2013, immediately after the expiration of the exclusivity period, DISH announced that it would act through LBAC as a stalking horse bidder in an Ad Hoc Plan. As the Bankruptcy Court later recognized, DISH -- as the stalking horse bidder and largest holder of LP Debt with control over the proceedings,-- was in a unique position to dissuade others from participating in the auction for LightSquared's assets. Moreover, as described below, Defendants required supporters of the Ad Hoc Plan, including the Ad Hoc Secured Group, to enter into a plan support agreement ("PSA") foreclosing them from negotiating on alternate plans.

103. The Sound Point Defendants had encouraged the Stalking Horse Bid, motivated by potential advisory fees that they could receive which would be paid by LightSquared. Moreover, the Sound Point Defendants had earlier encouraged the RICO Enterprise to engage bankruptcy counsel and consulted with the RICO Enterprise regarding joining the Ad Hoc Secured Group.

104. Unbeknownst to Harbinger, LightSquared and the Ad Hoc Secured Group, the Stalking Horse Bid was completely illusory. As discussed further herein, Defendants had negotiated ways to disavow the Stalking Horse Bid and ultimately manufactured a pretextual reason to cancel it in order to further extend the Bankruptcy Proceedings until the point where

LightSquared and its creditors would run out of cash and the DISH Defendants could obtain

LightSquared's assets for even less.

### D.   Defendants Knew LightSquared's Assets Were Worth Far More Than The LBAC Bid.

105.   At all times, Defendants knew that LightSquared's assets were worth far in excess

of the amount of the LBAC and Stalking Horse Bids.  However, it was not until after the close of

evidence on the Adversary Proceeding, that SPSO produced documents in connection with the

LightSquared Bankruptcy Proceeding that established how valuable the LightSquared assets

were in general and in particular to DISH.  The Valuation Materials consisted of presentations

prepared by Ergen and DISH's Special Committee's financial advisors that attributed values in

excess of $7 billion to LightSquared's assets.

106.   *First*, on July 3, 2013, Ergen sent an email to DISH board members, an in-house

attorney, and a Senior Vice President for DISH, attaching a six-page presentation dated July 8,

2013, that he had prepared, entitled "Strategic Investment Opportunity -- L-Band Acquisition,

LLC" (the "Ergen July 8 Presentation").  The Ergen July 8 Presentation was delivered via the

wires to DISH's Special Committee and to Perella Weinberg Partners ("PWP"), financial advisor

to the DISH's Special Committee some of whom were based in New York, among others.  In it,

Ergen highlighted the "unique opportunity" that LBAC had "to acquire spectrum assets through

an on-going bankruptcy process."  Consistent with the scheme implemented throughout the

Bankruptcy Proceeding, Ergen's end-game for the LightSquared spectrum assets, which could be

uniquely combined with DISH's spectrum, was revealed:  "The [LightSquared] low band

spectrum is uniquely positioned due to its excellent propagation characteristics."

107.   The Ergen July 8 Presentation assigned a range of value of LightSquared's assets

to DISH of between $5.174 and $8.996 billion, with a mid-range of $7.085 billion.  This

valuation included a range of values between $1.521 billion and $2.223 billion, with a mid-point of $1.872 billion, solely attributable to what Ergen considered to be synergistic value that DISH could unlock by purchasing LightSquared's spectrum.  As the Bankruptcy Court concluded, "[s]uch an enormous value could not have simply occurred to Mr. Ergen in an epiphany in the days or weeks before making such a detailed presentation"; rather, Ergen must have perceived the "synergistic value reflected in this presentation much earlier, as he monitored the actions of the FCC and the movement of the pieces on the wireless spectrum chessboard, some of which he himself was moving."

108.    *Second*, the DISH Defendants also failed to timely produce PWP's nine-page presentation dated July 21, 2013 that was presented to the DISH board (the "PWP July 21 Summary").  In a section captioned "Illustrative Value of DISH's Use Cases Related to LightSquared," the PWP July 21 Summary concludes that "[t]he cumulative value of the illustrative use cases that leverage the LightSquared LP acquisition is estimated to be $4.4-$13.3bn."

109.    *Finally*, the DISH Defendants withheld PWP's 69-page presentation, dated July 2013 and entitled "Project Discus Discussion Materials" (the "PWP Report").  The PWP Report was transmitted via email by PWP in New York to DISH in Colorado and others.  The PWP Report also concludes that "[t]he cumulative value of the illustrative use cases that leverage the LightSquared LP acquisition is estimated to be $4.4-$13.3bn."  The PWP Report further recites: "In June 2013, [SPSO] joined the Ad Hoc Secured Group to prevent termination of LightSquared LP's obligation of the Exclusivity stipulation."

110.    The foregoing conclusively establishes that DISH and Ergen were aware at all times of the inherent value in LightSquared's spectrum and its actual and potential synergies

with DISH's spectrum, and that this value far exceeded Defendants' illusory bids. Indeed, the Bankruptcy Court refused to allow the DISH Defendants in the Bankruptcy Proceeding to back away from their strong valuations of the spectrum: "The [Ergen July 8 Presentation] offers strong support for the proposition that LightSquared's assets have tremendous value in the hands of DISH . . . ." As the Bankruptcy Court realized, "[b]ased on all of the valuation evidence in the record, it is clear that LightSquared is indeed the owner of valuable spectrum assets, unbuilt beachfront property that has yet to be put to its highest and best use."

      **E.**     **SPSO Misrepresents The Value Of The LBAC Bid.**

      111.    Despite knowing the true value of LightSquared's assets -- as reflected in the Valuation Materials and Ergen's testimony -- SPSO concealed this information, instead repeatedly making knowing misrepresentations to the parties and the Bankruptcy Court that the bids were for a fair value. The RICO Enterprise's goal was to convince the parties and the Bankruptcy Court that LightSquared and Harbinger would violate their fiduciary duties by not taking the grossly undervalued LBAC and Stalking Horse Bids seriously. The RICO Enterprise thereby sought to create the impression of a conflict between, on the one hand, LightSquared, which was obligated by its fiduciary duties to indulge the holders of LP Debt in addition to its other stakeholders, and, on the other, Harbinger, which would naturally seek to reject this inadequate and illusory bid. However, in fact there was no conflict whatsoever, because as Defendants knew, both LightSquared and Harbinger were correct to oppose the grossly undervalued LBAC Bid.

      112.    Immediately after making the LBAC Bid -- and despite knowing that it was unreasonably low -- the Defendants in Colorado by use of the wires, and knowing that further use of the wires and mail would be likely, directed Willkie in New York to email counsel for LightSquared, seeking quick action on the LBAC Bid. Defendants thereby sought to create a

misleading record to establish that LightSquared was not taking the -- grossly insufficient -- bid sufficiently seriously.

113. Then, on July 9, 2013, in connection with litigation related to Harbinger and LightSquared's attempt to further extend the exclusivity period based in part on Defendants' improper interference with creditor negotiations, SPSO sought to convince the Bankruptcy Court that the LBAC Bid created a conflict of interest between Harbinger and LightSquared. Specifically, SPSO argued that "LightSquared [was not] governed by a typical, non-conflicted fiduciary. . . . Were a non-conflicted fiduciary in charge of the LP estates, litigation and protracted negotiations would not have been required to induce the LP Debtors to maximize the value of its estates for the benefit of their stakeholders." At the behest of SPSO, drawn in by Defendants' misrepresentations and illusory and undervalued Stalking Horse Bid, the Ad Hoc Secured Group echoed these arguments, stating because LightSquared which was "admittedly controlled by Harbinger, not only as a matter of law and through the board and through the equity holdings but also as a matter of their affirmative pleadings," Harbinger was not "in a position to be the party that operates an auction." These statements -- as Ergen's own valuation created less than one week prior conclusively shows -- were false. Instead, the LBAC Bid severely undervalued LightSquared's assets and Harbinger and LightSquared's interests were therefore aligned in seeking to obtain a higher bid.

114. On July 23, 2013, immediately after making the Stalking Horse Bid, counsel for SPSO, at the direction of Ergen, began objecting to the Bankruptcy Court about LightSquared's failure to act fast enough in submitting a nondisclosure agreement and stating that "[w]hen you offer a company that is in Chapter 11 two billion dollars of cash, and at this point, no meeting, no NDA offered, no phone call, whatsoever . . . that is huge -- when you've got a bag [of] two

47

billion dollars in cash sitting on your front porch, that speaks volumes." SPSO repeatedly referred to the Stalking Horse Bid as a "bag of cash" and emphasized its importance, stating, "our asset purchase agreement isn't a fantastical, Swiss cheese, meaningless document. It's a very real offer for very real green money." Indeed, despite knowing that the bid was grossly undervalued, Defendants accused Harbinger of initiating litigation solely to block what they characterized as a "good faith" bid. These representations again were false, misleading and deceptive in light of Ergen and DISH's own valuations which concluded the value of LightSquared's assets far exceeded the Stalking Horse Bid. These representations were further false because, as detailed herein, the Defendants in fact had no intention of consummating its offer.

## IV. THE RICO ENTERPRISE'S SCHEME CAUSES HARBINGER TO LOSE ITS CONTRACTUAL RIGHTS WITH RESPECT TO LIGHTSQUARED.

115. As the RICO Enterprise intended, the Defendants' bids and related misrepresentations had a twofold effect meant to bring Defendants closer to acquiring LightSquared's assets by removing Harbinger from the board: *First*, the illusory bids placed Harbinger at odds with the Ad Hoc Secured Group with which it had been negotiating a plan, which, as the Bankruptcy Court acknowledged and the RICO Enterprise knew, would naturally want to pursue the bids because it satisfied their own interests, if not the interests of the other stakeholders. *Second*, SPSO's illusory bids along with its misrepresentations as to their adequacy and false accusations as to the propriety of Harbinger's opposition created the appearance of a false conflict between Harbinger and LightSquared that could only be resolved through the appointment of the LightSquared Special Committee. The Defendants' actions had the intended effect of stripping Harbinger of its valuable contractual rights pursuant to the

Stockholders' Agreement, which are independent and incremental to the value of its equity holdings.

### A.  The RICO Enterprise's Scheme Causes Creditors To Oppose Harbinger's Control Over LightSquared.

116.    Negotiations with the Ad Hoc Secured Group began to devolve immediately upon issuance of the LBAC Bid on May 15, 2013.  These creditors, who previously were willing to negotiate with Harbinger, began agitating for a swift sale process that would cash them out in full.  Indeed, as the Bankruptcy Court acknowledged, and the RICO Enterprise knew, it was "economically rational" for the Ad Hoc Secured Group to want to close on the bid as quickly as possible.

117.    On June 13, 2013, SPSO joined the Ad Hoc Secured Group to (i) keep the sale provisions of the Exclusivity Order in effect by ensuring the Ad Hoc Secured Group collectively remained the largest holders of LP Debt as the Exclusivity Order required; (ii) drive a wedge between Harbinger and the Ad Hoc Secured Group, such that the Ad Hoc Secured Group would support Defendants' efforts to remove Harbinger from the board of LightSquared and support a sale of LightSquared's assets at fire-sale prices; and (iii) as the Bankruptcy Court found, interfere with the purpose of the Exclusivity Order by stymieing Harbinger and LightSquared's ability to engage in the good faith negotiations contemplated therein.  Within days of joining the Ad Hoc Secured Group, several hundreds of millions of dollars in "hung" trades closed, as discussed further herein, making SPSO the controlling member by virtue of the size of its holdings.

118.    As the Bankruptcy Court found, "SPSO's decision to join the Ad Hoc Secured Group was undoubtedly made for the strategic purpose of controlling the sale process for the Debtors' assets, with DISH as the buyer, and the fact that it rendered the negotiated and Court-ordered exclusive period meaningless was ignored."  Defendants' actions "subvert[ed] the

intended operation of a court-approved exclusivity termination arrangement, and . . . prevent[ed] the Court from directing and having visibility into events unfolding in the case." The Bankruptcy Court therefore found that "SPSO failed to act in a way that is consistent with the most basic concepts of good faith that are fairly to be expected of chapter 11 creditors, especially those who voluntarily join the capital structure of a debtor well after distress has set in."

119. Just seven days after the expiration of the Exclusivity Period, on July 23, 2013, SPSO had successfully convinced the Ad Hoc Secured Group to file an SPSO-backed Ad Hoc Plan, pursuant to which the Ad Hoc Secured Group signed onto the PSA. The PSA bound the Ad Hoc Secured Group to support LBAC's Stalking Horse Bid and forbade them from negotiating on other plans, stating that the parties thereto "[s]hall not directly or indirectly seek, solicit, support, or vote in favor of any other plan, sale, proposal, or offer of dissolution, winding up, liquidation, reorganization, merger, or restructuring of the Debtors other than the Plan[.]" In essence, negotiations with the LP Debt Lenders were rendered a "moot point" once the Ad Hoc Secured Group signed the PSA. Indeed, a representative for the Ad Hoc Secured Group testified that with Defendants in the picture, it could no longer negotiate a common plan with Harbinger or LightSquared: "It was just clear to me that the Ergen participation meant that there was a creditor in the capital structure that we thought made sense to deal with separately."

120. The Ad Hoc Secured Group, through their lead advisor from the Blackstone Group LP, testified that absent being bound by the PSA, however, it would have reached an agreement with Harbinger: "[W]e would have continued negotiating with the Harbinger and debtor parties on a resolution and we would have picked an alternative path. This company had to emerge from bankruptcy just given its capital structure and liquidity profile. And we would

have worked to have found a resolution, one of which would have been -- could have been the Harbinger parties."

121.    Further, the PSA included broad releases insulating the DISH, Ergen, and SPSO from liability and ensuring that Ergen would be paid in full on the account of SPSO's LP Debt holdings.

122.    The RICO Enterprise had therefore successfully executed the portion of its scheme to disrupt Harbinger's negotiations with creditors and drive the Ad Hoc Secured Group to oppose Harbinger's efforts to create a plan of reorganization, instead supporting SPSO's effort to displace Harbinger from the board of LightSquared.

### B.    The RICO Enterprise's Scheme Causes Harbinger To Lose Its Board Seats.

123.    In September 2013, in response to concerns of the artificial conflict raised by SPSO, the Bankruptcy Court held a series of hearings related to whether Harbinger should be able to dictate decisions related to LightSquared during the reorganization proceedings and assessment of the Stalking Horse Bid. Ultimately the Defendants succeeded in displacing Harbinger and having the LightSquared Special Committee appointed, stripping Harbinger of its rights under the Stockholders' Agreement, including its ability to appoint and remove a majority of board members.

124.    The Bankruptcy Court itself noted that LightSquared had a duty to "try to do better" than the bid, as Harbinger had been trying to do. However, the Bankruptcy Court nonetheless sided with the Defendants -- based on their misrepresentations that the Stalking Horse Bid was adequate -- that Harbinger was conflicted in opposing the bid. The Court explained that "[t]he reason that we're going to a special committee is so we can have someone exercising business judgment unconnected or influenced by the equity in this case. That's the

point of this." The Bankruptcy Court wanted a Special Committee to "let the debtor operate completely independently" of Harbinger and "neutralize the concern about the control of the equityholder."

125. Thus, as directed by the Bankruptcy Court, LightSquared's board of directors appointed three independent LightSquared Special Committee members on September 16, 17, and 27, 2013. The specter of the false conflict hung over the appointment process, with the Bankruptcy Court threatening that if "you're uncomfortable that members of the special committee will be beholden to anyone, then I won't ask any of you and I'll pick the members myself." On October 1, 2013, the Bankruptcy Court ordered that all actions and decisions on behalf of LightSquared related to the plan process, an auction, or a sale, be made by a LightSquared Special Committee. And on October 2, 2013, the Bankruptcy Court endorsed the appointment of the LightSquared Special Committee, entering an order providing for their compensation and indemnification.

126. The LightSquared Special Committee was ultimately vested with the power to make all material decisions related to reorganization. Specifically, the purpose of the Special Committee is:

> (i) to oversee the potential sale of the Company's assets . . . in connection with any auction process . . . and (ii) to evaluate potential restructuring or plans of reorganization, including with respect to any financing involving the Company and its subsidiaries, filed by the Company . . . in each case in connection with the Company's and its subsidiaries' Chapter 11 cases.

127. The Bankruptcy Court itself, relying on Defendants' false and misleading representations regarding the adequacy of the Stalking Horse Bid, ordered bidding procedures that stated that "[f]or the avoidance of doubt, any decision to be made, or action to be taken, by LightSquared under the Bid Procedures, the Auction, and any resulting Sale, shall be made or taken at the direction of the independent committee of LightSquared's board of directors." In

fact the Bankruptcy Court required that "any decision to be made by LightSquared under these Bid Procedures, or in connection with the plan process . . . shall be made by the independent committee of LightSquared's board of directors." Further usurping Harbinger's right to govern LightSquared, the LightSquared board was forced to resolve that the LightSquared Special Committee members could not be removed without Bankruptcy Court approval.

128. The LightSquared Special Committee -- independently of Harbinger -- did in fact proceed to make decisions with respect to all matters important to LightSquared (and Harbinger), including evaluating proposed reorganization plans, running the auction process, participating in meetings with stakeholders and the FCC, and entering into discussions with potential purchasers of LightSquared's spectrum. The LightSquared Special Committee continually filed progress reports with the Bankruptcy Court regarding the numerous actions as to which it had displaced Harbinger, including: (i) approval of LightSquared's action against SPSO and its affiliates; (ii) approval of the GPS litigation; (iii) negotiation of bidding procedures; (iv) evaluation of various plans; and (v) approval of the Plan. Notably, the LightSquared Special Committee's take over of all negotiations related to the auction and its proposal of its own plan of reorganization, deprived Harbinger of the credibility and support behind its own plan. Moreover, once the LightSquared Special Committee had displaced Harbinger's control over the board, LightSquared's management went so far as to demand that that Harbinger cease its own communications with the FCC -- communications that Harbinger deemed necessary to protect its own interests.

129. Accordingly, as a result of the RICO Enterprise's fraudulent scheme, Harbinger was stripped of its contractual rights under the Stockholders' Agreement, including its rights to appoint and remove the majority of directors, appoint committee members, chair committees, and dictate key management decisions. Practically speaking, Harbinger lost the ability to

participate in all material decisions related to LightSquared necessary to protect its investment. Indeed, with its ability to control LightSquared's board gone and after receiving LightSquared's demand that it stop speaking to the FCC, Harbinger was forced to resign from the board in order to preserve other courses of action to protect its investment that otherwise might potentially be viewed as a conflict, despite Harbinger's complete absence from LightSquared's decision-making. Irrespective of Harbinger's resignation, the unique value of its rights under the Stockholders' Agreement had already been eviscerated as a result of the Fraudulent Scheme.

## V. THE RICO ENTERPRISE TERMINATES THE BID UNDER FALSE PRETENSES AND ENGAGES IN FURTHER WRONGDOING.

### A. DISH Terminates The Stalking Horse Bid Under False Pretenses.

130. After successfully stripping Harbinger of its rights by forcing the appointment of the LightSquared Special Committee and upending Harbinger's negotiations with the creditors, the RICO Enterprise members under false pretenses abruptly terminated the Stalking Horse Bid on January 9, 2014, as trial in the Adversary Proceeding commenced. By terminating the Stalking Horse Bid, the Defendants could push LightSquared to the brink of liquidation and acquire the spectrum assets below $2.2 billion without interference from Harbinger, which had been displaced by the LightSquared Special Committee. Indeed, Defendants' behavior here strikingly resembles its conduct in acquiring the assets of DBSD -- discussed above -- in which DISH was willing to play a "long game" to acquire the assets at the lowest price possible. There, Ergen's original bid -- placed via the wires in September 2009 -- was litigated for over a year until DISH came forward in February 2011 with a subsequent offer for the assets. During that entire intervening time -- as Defendants did with LightSquared -- DISH steadfastly denied that it would make any further, more reasonable offers. In fact, once its hand was forced by the Second

Circuit, it turned out that DISH was ultimately willing to acquire DBSD's assets for a higher price.

131.    In December 2013, as part of the bidding process for LightSquared's assets under the Ad Hoc Plan, an auction was scheduled with SPSO serving as the stalking horse bidder. However, Ergen never intended to consummate the Stalking Horse Bid. Instead, he sought to ensure no other bidders materialized at the auction, paving the way for Ergen to pursue an even more favorable deal for the spectrum. Ergen's plan to make a bid it knew was not viable may be inferred from the Ergen Presentation, in which he noted that "[i]f proposal not accepted, Newco will have the ability to see results of marketing process and, if process is unsuccessful, revert with a different bid later."

132.    In furtherance of this scheme, in or around November 2013, Ergen pushed for a public disclosure of a purported "technical issue" that the DISH Defendants claim to have discovered in due diligence. Such a disclosure is contrary to market practice, whereby potential bidders conduct their own due diligence without disclosing their findings. However, by falsifying a purported "technical issue," Ergen could dissuade any interested bidders.

133.    When LightSquared did not receive any other qualified bids, as Ergen planned, the December auction was cancelled. Ergen then attempted to renegotiate the terms of his offer, proposing a new, discounted proposal for the acquisition of substantially all of LightSquared's assets for DISH, including assets not previously included in the LBAC Bid. These efforts were ultimately unsuccessful.

134.    Accordingly, on the eve of trial in the Adversary Proceeding, to wreak further havoc on Harbinger's chances to obtain a plan of reorganization, DISH cancelled its bid by letter dated January 9, 2014, sent via email from S&C in New York to counsel for the Ad Hoc Secured

Group in Miami, copying DISH in Colorado. DISH cited a purported "technical issue" as the reason for its termination. The "technical issue," however, was clearly a pretext manufactured by the DISH Defendants. In fact, weeks before an auction occurred, the DISH Defendants had purportedly uncovered the "technical issue," but were still willing to move forward with the auction and the DISH board approved raising the bid to include certain assets of LightSquared Inc., previously excluded from the prior bid. As the Bankruptcy Court found, "no attempt was ever made by DISH to solve, let alone quantify, the technical issue, which allegedly stood in the way of the realization by DISH of billions of dollars of supplemental asset value. It is indeed a curious thing." As a result, the Bankruptcy Court noted that there was "credible and compelling testimony that the technical issue is unlikely to exist at all," while "Mr. Ergen's testimony on this point was not credible."

135.    Indeed, the termination of the Stalking Horse Bid was merely another trick up Ergen's sleeve to manipulate the Bankruptcy Proceeding to the RICO Enterprise's advantage by waiting for LightSquared to run out of operating cash and snatching LightSquared's assets at bargain basement prices.

   **B.    The RICO Enterprises Falsely Accuses Falcone Of Wrongdoing.**

136.    In order to further sabotage Harbinger's standing with both the Bankruptcy Court and the LightSquared Special Committee, on April 4, 2014, Ergen, through SPSO, publicly filed a specious motion seeking leave to assert claims on behalf of the Debtors' estates for breach of fiduciary against Philip Falcone, Harbinger's founder and Senior Managing Director. *See Motion of SP Special Opportunities, LLC for Entry of an Order Granting Leave, Standing and Authority to Commence, Prosecute and/or Settle Certain Claims of the Debtors' Estates Against Philip Falcone* [Adv. Dkt. No. 1473]. Ergen's bad-faith motion falsely claimed that Mr. Falcone violated his fiduciary duties as a LightSquared board member by favoring Harbinger's interests

over those of LightSquared.  Upon information and belief, Ergen's goal was not to prevail on this

baseless motion or to vindicate any right of the Debtors, but to further derail Harbinger's rights

under the Stockholders' Agreement and undermine Harbinger's credibility with the Bankruptcy

Court and the LightSquared board.  While the Bankruptcy Court refused to even entertain the

frivolous motion, the damage was done, and Harbinger's ability to influence the direction of the

LightSquared board was further undermined.

### C.   Ergen And SPSO Negotiate In Bad Faith.

137.   Ergen and SPSO continued to attempt to disrupt negotiations to reach a

consensual plan even after the Bankruptcy Court issued its June Decision.  In connection with

the June Decision, Judge Chapman ordered the parties to commence mediation before Judge

Robert D. Drain of the United States Bankruptcy Court for the Southern District of New York.

Over the course of the three day-long sessions, Ergen left the mediation without Judge Drain's

permission and failed to make a promised proposal for resolution.  On June 27, 2014, based in

part on this behavior, Judge Drain concluded in the mediator's memorandum filed with the

Bankruptcy Court that SPSO and Ergen "[had] not participated in the mediation in good faith

and [had] wasted the parties and the mediator's time and resources."  Judge Drain noted that he

understood "the seriousness of the assertion" and in fact characterized it as "unique in [his]

experience as a mediator in a field where the parties are known to assert their positions

aggressively and sharp elbows in negotiations, although not welcome, are tolerated."

## VI.   THE RICO ENTERPRISE -- CONSISTENT WITH THEIR PAST CONDUCT -- OBSTRUCTED THE BANKRUPTCY PROCEEDING TO FURTHER ITS SCHEME TO ACQUIRE LIGHTSQUARED'S ASSETS.

138.   The DISH Defendants have a history of abusing the judicial process in courts

around the country by committing perjury and destroying evidence to achieve their own ends.

Indeed, it has been reported that "Dish employees, adversaries and analysts say no one exploits

the judicial system like Ergen does to gain a competitive advantage." (Eriq Gardner, *Dish Network's Charlie Ergen is the Most Hated Man in Hollywood*, Hollywood Reporter (Apr. 2, 2013) ("*Hollywood Reporter*") at 4.) In Ergen's own words: "I may be the only CEO who likes to go to depositions . . . You can live in a bubble, and you're probably not going to get a disease. But you can play in the mud and the dirt, and you're probably not going to get a disease either, because you get immune to it. You pick your poison, and I think we choose to go play in the mud." (Caleb Hannan, *Dish Network, the Meanest Company in America*, Bloomberg Businessweek (Jan. 2, 2013) at 6.) Ergen admits, "[w]hen I talk to lawyers it's . . . more about, you know, how can I do this, as opposed to what the law says."

139. These tactics have led numerous courts to sanction and reprimand Ergen and his companies year after year:

- In 2005, in a sexual harassment suit against EchoStar, DISH's predecessor and former parent, the United States Court for the District of Maryland found EchoStar guilty of bad faith spoliation, calling its behavior "indefensible," and awarding sanctions against it. *See Broccoli v. EchoStar Communications Corp.*, 229 F.R.D. 506 (D. Md. 2005).

- The same year, the Tenth Circuit affirmed the imposition of fees and costs against EchoStar in a separate action, finding that "the District Court did not abuse its discretion in awarding . . . attorneys' fees and costs" stemming from sanctions against "EchoStar's attorneys." *Dominion Video Satellite, Inc. v. EchoStar Satellite L.L.C.*, 430 F.3d 1269, 1280-81 (10th Cir. 2005). The District Court had "determined that EchoStar had unreasonably and vexatiously extended the arbitration hearings and court proceedings." *Id.* It found that "the arguments presented on behalf of EchoStar were completely meritless" and that EchoStar's "attorneys need not have filed lengthy briefs at every stage of the arbitration and court proceedings in order to preserve EchoStar's arguments for appeal." *Id.* at 1279. Further, "the District Court noted that EchoStar's arguments … were 'disingenuous,' 'exceedingly fanciful,' and based on 'a gross contortion' of governing law." *Id.* at 1273.

- In 2006, the Eleventh Circuit upheld an injunction against EchoStar for its retransmission of certain programs in violation of the Copyright Act. *CBS Broadcasting, Inc. v. EchoStar Communications Corp.*, 450 F.3d 505 (11th Cir. 2006). The court found "no indication that EchoStar was ever interested in complying with the Act. Indeed, based on the district court's findings, we seem

to have discerned a 'pattern' and 'practice' of violating the Act in every way imaginable. Importantly, the court noted that "[i]n an effort to dissuade the district court from issuing the original injunction in this case, **EchoStar's CEO, Charles Ergen, made a formal pledge under penalty of perjury in September 1999 . . . [to] terminate all ineligible subscribers."** *Id.* at 513 (emphasis added). **Yet, "[c]ontrary to Ergen's promise, the district court found no evidence that EchoStar terminated service to any of these subscribers for compliance-related purposes."** *Id.* at 514 (emphasis added).

- In *TiVo Inc. v. Dish Network Corp.*, 655 F. Supp. 2d 661 (E.D. Tex. 2009), the court granted in part plaintiff's request for "appropriate contempt sanctions" because "EchoStar had failed to comply with the plain directives of this Court's order." The court further "noted the contentious nature of this case and … expressed disapproval for some of the tactics used by the parties" and described EchoStar's behavior as "distasteful." *Id.* at 665.

- In *VOOM HD Holdings LLC v. EchoStar Satellite L.L.C.*, 93 A.D.3d 33 (1st Dep't 2012), the court again sanctioned EchoStar for spoliation, finding that "[t]he record shows that EchoStar acted in bad faith in destroying electronically stored evidence" and was at best "grossly negligent, if not intentional." *Id.* at 46.

140. Consistent with their past conduct, the DISH Defendants in attempting to acquire LightSquared's assets, breached the "outer limits" of what would be tolerated in the LightSquared Bankruptcy Proceeding, as the Bankruptcy Court noted. To further their Fraudulent Scheme, the RICO Enterprise not only illegally entered LightSquared's capital structure but were an "affront" to the Chapter 11 process, keeping trades open to disrupt negotiations and violating the Bankruptcy Court's Exclusivity Order, repeatedly giving false testimony under oath, filing false statements with the Bankruptcy Court, concealing critical evidence to mislead the Bankruptcy Court and terminating their bid under false pretenses to force a liquidation of LightSquared's assets so they could acquire the spectrum assets at fire-sale prices. Although the RICO Enterprise was successful in stripping Harbinger's rights under the Stockholders' Agreement, the RICO Enterprise's Fraudulent Scheme continues to evolve in their quest to acquire spectrum assets through wrongful means and they pose a substantial threat in the future.

A. **Defendants Repeatedly Made Misrepresentations Throughout
The Bankruptcy Proceeding.**

141.   In an effort to conceal the Fraudulent Scheme and mislead the parties and the

Bankruptcy Court, Defendants knowingly and repeatedly filed false statements with the

Bankruptcy Court and made false statements under oath.

142.   *First*, Defendants' made misrepresentations related to DISH's knowledge of and

role in SPSO's trades -- information critical to linking the RICO Enterprise members' role in the

scheme.  For instance, SPSO, through its counsel, falsely claimed in its stipulation filed on July

9, 2013 with the Bankruptcy Court ("SPSO Stipulation"), that "Ergen has not disclosed to DISH

or EchoStar the amounts, prices or dates of SPSO's purchases of Prepetition LP Obligations."

This statement in the SPSO Stipulation was entirely false.  Kiser, Treasurer of DISH, was

entirely familiar with the details of the LP Debt trades having managed SPSO's trading

activities.  Also, Ergen had already explicitly disclosed his holdings of more than $1billion of LP

Debt to the DISH board through the Ergen Presentation which predated the SPSO Stipulation.

The Bankruptcy Court found SPSO's "stunning lack of candor" was an "affront to the duty of

good faith imposed on those who participate in Chapter 11 proceedings."

143.   *Second*, as discussed above, Defendants made repeated misrepresentations to the

parties and the Bankruptcy Court that the LBAC and Stalking Horse Bids were valid and fair

bids when in fact Defendants knew the bids represented a fraction of the LightSquared's value

and that they had no intention of executing the bids.  Defendants later terminated the bids,

manufacturing a pretextual reason for its termination under what the Bankruptcy Court found to

be "curious" circumstances.

144.   *Third*, as part of the RICO Enterprise's scheme, Defendants purposefully delayed

the closing trades of LP Debt, seeking "to defer settlement as long as possible," and "effectively

sidelin[ing] hundreds of millions of dollars of LP debt during the weeks and months leading to the court sanctioned termination of exclusivity[] on July 15, 2013, all while SPSO, Mr. Ergen and eventually LBAC and DISH fine-tuned their bid strategy." After interfering with the provision of the Exclusivity Order requiring good faith negotiations with creditors at minimal cost to Defendants, Defendants suddenly joined the Ad Hoc Secured Group and closed its trades so that it could uphold the provision of the Exclusivity Order requiring a sale at the close of the exclusivity period. This activity breached the "outer limits" of acceptable behavior in a bankruptcy proceeding and violated the Exclusivity Order.

145. When called to task for their misconduct, however, Defendants obstructed justice and further disrupted Harbinger's relationship with creditors by making repeated material misrepresentations to the Bankruptcy Court related to the trade closings. On July 9, 2013, SPSO submitted the SPSO Stipulation, falsely proclaiming "the timing of closing of each of SPSO's acquisitions of [LP Debt] was primarily driven by the sellers of such claims" when in fact, as the Bankruptcy Court found, the delays were entirely the result of Defendants' stonewalling.

146. Then, at an October 29, 2013 hearing, counsel for Sound Point falsely claimed that "Sound Point [did not] act as the driver of when the closing dates occur[ed]" and was only "involved in documentation of closing trades . . . [b]ut again, solely in a nondiscretionary . . . capacity." However, evidence emerged that Sound Point repeatedly manufactured excuses to counterparties to delay the closing of the trades and in fact drafted a list of predetermined settlement dates that went well beyond the average time frame a trade would close. This led the Bankruptcy Court to reprimand Sound Point for its misrepresentations about being an innocent broker that had no involvement in the Defendants' misconduct, stating that the Bankruptcy Court "relied on that in dismissing [Sound Point] from this lawsuit."

147.   Moreover, to conceal their respective roles in intentionally delaying the closing of the LP Debt trades, the individual RICO Enterprise members provided wildly divergent and inconsistent explanations for the delays at the Adversary Proceeding Trial, claiming:  (i) there were legitimate economic benefits to delaying the settlement of the LP Debt trades; (ii) Ergen did not have immediate liquid funds available to settle the trades; or (iii) the necessary paperwork or "upstreams" were not complete to enable settlement of the trades.  As the Bankruptcy Court explicitly found, none of these excuses were credible.

148.   *Finally*, Defendants, as discussed above, also gave perjurious testimony during the Bankruptcy Proceeding concerning:  (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding the LP Debt purchases and (ii) the reason for the DISH Defendants voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing.

## VII.   THE RICO ENTERPRISE'S SCHEME INJURED HARBINGER.

149.   Harbinger invested significant capital, labor, resources and expertise in developing LightSquared's spectrum assets and building out an ATC Network.  Harbinger entered into the Stockholders' Agreement with LightSquared and other shareholders to protect its unique interests in LightSquared and continued to augment its investment in LightSquared and expend its resources in reliance on the protections afforded by the Stockholders' Agreement.  As set forth above, the Stockholders' Agreement provides Harbinger with expansive rights with respect to LightSquared as a majority shareholder.  For example, under the Stockholders' Agreement, Harbinger had a right to:  (i) appoint and remove the majority of the LightSquared board; (ii) designate committee members; (iii) chair committees; and (iv) approve critical management business decisions through its board votes.

150. Harbinger lost its valuable bargained-for rights as a direct result of Defendants' wrongful and fraudulent conduct in (a) illegally purchasing the LP Debt, (b) making knowingly undervalued and illusory bids to drive a wedge between Harbinger and the Ad Hoc Secured Group and create the false appearance of conflict, (c) misrepresenting that Harbinger was conflicted by opposing what they stated was a "good faith" bid, (d) obstructing justice through concealing and misrepresenting material evidence related to the foregoing. Defendants knew that removing Harbinger -- the party most concerned with maximizing LightSquared's value -- from control of the LightSquared board was essential to forcing down the price of LightSquared's assets. Had Harbinger known that the Defendants were affirmatively engaging in a Fraudulent Scheme to displace it from the LightSquared board, it would have taken action to protect and enforce its rights under the Stockholders' Agreement.

151. The Fraudulent Scheme and the chaos it created directly and proximately resulted in the appointment of the LightSquared Special Committee, which took over all decisions related to LightSquared's reorganization without the involvement of Harbinger, destroying Harbinger's rights and breaching the Stockholders' Agreement. Harbinger thereby lost its rights to appoint a majority of directors, designate committee members, chair committees, and make key management decisions pursuant to its board control, which provided a substantial value to Harbinger incremental to and independent of the value of its equity alone, and provided crucial protection to Harbinger in bankruptcy against the influence of creditors. Indeed, Harbinger was ultimately forced to resign from the board upon which it had been rendered impotent. Further, Defendants' actions dragged out the Bankruptcy Proceedings, costing Harbinger millions more in otherwise-unnecessary legal fees.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### RACKETEERING VIOLATION OF 18 U.S.C. § 1962(c)
### (AGAINST ALL DEFENDANTS)

152.     Plaintiffs restate each and every allegation of paragraphs 1 through 151 as if fully set forth herein.

153.     Defendants are persons as that term is defined in 18 U.S.C. § 1961(3).

154.     Between the summer of 2009 through January 2014 (the "Relevant Period"), each of the Defendants and EchoStar were associated with the RICO Enterprise, which constituted an associated-in-fact "enterprise" within the meaning of 18 U.S.C. § 1961(4) and 1962(c). The RICO Enterprise was engaged in, or activities of which affected, interstate commerce through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and 1962(c).

155.     The common purpose of the Defendants' actions in furtherance of the RICO Enterprise was to use artifice, deceit, misinformation, and dishonest means to wrest away from LightSquared the valuable wireless spectrum assets held by LightSquared while in bankruptcy, and strip Harbinger of the valuable rights it held pursuant to the Stockholders' Agreement.

156.     While operating outside of a unified corporate structure, each of Defendants DISH, SPSO, SO Holdings, and LBAC were, at some or all times during the Relevant Period, solely-owned or controlled by Defendant Ergen and each, along with Ketchum and Sound Point, engaged in a coordinated effort to use criminal and deceitful means to gain an unfair strategic advantage in the Bankruptcy Proceeding to acquire LightSquared's assets for DISH and deprive Harbinger of its contractual rights to maintain a majority of the board seats. By displacing Harbinger from the LightSquared board, Harbinger was unable to stop the Defendants from influencing the Chapter 11 process with the goal of acquiring LightSquared's assets through wrongful means. In exchange for fees from Ergen and the promise of a lucrative future business,

the Sound Point Defendants knowingly engaged in conduct in furtherance of the RICO

Enterprise by (i) executing LP Debt trades in furtherance of the scheme at the direction of the

DISH Defendants; (ii) creating fronts to facilitate the illegal purchases of the LP Debt;

(iii) assisting to manipulate the closing of hundreds of millions of LP Debt trades; (iv)

communicating false and deceitful representations to counterparties and UBS; and (v) providing

false testimony in the Bankruptcy Proceeding.

157.    The association-in-fact enterprise has had sufficient longevity to allow the

Defendants to pursue the RICO Enterprise's purpose including through, among others, the

following actions:  (1) acquiring DBSD's spectrum assets and the LP Debt in bad faith; (2)

tracking LightSquared's movement towards bankruptcy as a possible acquisition target for

DISH; (3) forming the undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal

the true source of the LP Debt purchases to circumvent the transfer restrictions in the Credit

Agreement; (4) purchasing the LP Debt in breach of the Credit Agreement; (5) acting as a

competitor rather than an ordinary creditor in voting against an amendment that would have

allowed LightSquared to avoid bankruptcy; (6) making the LBAC and Stalking Horse Bids for

LightSquared's assets for far less than they are worth to gain the allegiance of the Ad Hoc

Secured Group; (7) concealing and misrepresenting the sufficiency of the LBAC and Stalking

Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip

Harbinger of its right to control LightSquared's board and committees; (8) terminating the

LBAC Bid under false pretenses in order to obtain an even lower price for LightSquared's assets

for DISH; and (9) obstructing justice in the  Bankruptcy Proceeding through bankruptcy fraud,

violating the Exclusivity Order, lying under oath, misrepresenting to the Bankruptcy Court the

existence of a conflict by virtue of Harbinger's opposition to their "good faith bid," and withholding material evidence.

158.    As set forth above, while participating in the conduct of the RICO Enterprise, Defendants have undertaken actions with same or similar purposes, results, participants, victims, and methods.  DISH used the interstate mails and/or wires in furtherance of a deceitful scheme to defeat a reorganization plan that would have permitted DBSD to emerge from bankruptcy so that DISH could purchase DBSD's assets in liquidation for less than their fair market value.  With respect to LightSquared, the participants in the RICO Enterprise (which had grown in size since the DBSD misconduct to include Ergen, SPSO, LBAC, Sound Point, and Ketchum) also committed wire and mail fraud, bankruptcy fraud, and obstruction of justice to (a) obtain a majority of LightSquared's LP Debt and thereby control of LightSquared's bankruptcy proceeding and (b) strip Harbinger of its rights under the Stockholders' Agreement by making false bids for LightSquared's assets and then claiming that Harbinger was in breach of its fiduciary duties by opposing the bids, despite knowing that the value of LightSquared's assets far exceeded the bids.  The racketeering activity of the RICO Enterprise consisted of multiple, related acts perpetrated during the Relevant Period that are within the scope of 18 U.S.C. §1961(1)(B) and (5).

159.    Defendants' misconduct carries the threat of continuing wrongdoing extending indefinitely into the future.  DISH is in the business of, among other things, acquiring spectrum assets, including through the bankruptcy process, and admits that it will continue to acquire more spectrum assets in the future.  As a matter of the routine conduct of their businesses, the DISH Defendants have engaged in systematic and ongoing misconduct of manipulating the bankruptcy process to acquire spectrum, including through the use of wire fraud, bankruptcy fraud, and

obstruction of justice in the underlying bankruptcy proceedings. The Defendants have not yet succeeded with their scheme to acquire LightSquared's assets and continue to use deceitful and wrongful means to push LightSquared towards liquidation to acquire LightSquared's spectrum assets, and there is a substantial threat that these Defendants will continue these practices into the future beyond the LightSquared bankruptcy given their past practices and their admitted desire to acquire more spectrum assets.

160. Additionally, Defendants have engaged in a series of related acts of misconduct, including wire and mail fraud, bankruptcy fraud and obstruction of justice extending over several years. In furtherance of the RICO Enterprise, DISH first engaged in wire fraud during the summer of 2009 in furtherance of a scheme to wrongfully prevent DBSD from emerging from bankruptcy. Similarly, in December 2011, the DISH Defendants used the wires to communicate concerning the creation of Bal Harbour -- a front used to deceitfully and illegally purchase the LP Debt. Beginning in at least as early as January 2012, the DISH Defendants tracked LightSquared's progress in bankruptcy via the wires. Defendants thereafter engaged in a continuous series of actions constituting racketeering activity, including acts in violation of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 152 (bankruptcy fraud), and 18 U.S.C. § 1503 (obstruction of justice). These ongoing acts of malfeasance extend as least as far as January 7, 2014, when Defendant LBAC used the interstate wires to wrongfully terminate its bid for LightSquared's assets in furtherance of Defendants' Scheme.

161. Each Defendant acted in violation of the federal wire fraud statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in furtherance of their Fraudulent Scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence from bankruptcy in order to purchase its spectrum assets at below market value, and to strip Harbinger

of its valuable rights under the Stockholders' Agreement.  It was reasonably foreseeable that the wires would be used to execute the Fraudulent Scheme.  As the RICO Enterprise's goal was to obtain LightSquared's valuable spectrum rights and deprive Harbinger of its rights, the Fraudulent Scheme involved money or property as its object.  As there are numerous communications within the exclusive control of Defendants which reveal Defendants' use of the mail and wires in furtherance of the Fraudulent Scheme, the Plaintiffs do not have access to all those communications.  The Plaintiffs allege, including upon information and belief as to matters peculiarly within Defendants knowledge, the following table sets forth some of the communications via interstate wires used by Defendants in furtherance of their Scheme.

| Table 1 | | | |
|---|---|---|---|
| **Acts of Wire and Mail Fraud** | | | |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| Approximately Spring to Summer 2009 | Ergen | DISH board | Ergen used the wires to state or cause to be stated, regarding DBSD, that "[w]e believe there is a strategic opportunity to obtain a blocking position in a second priority convertible note and control the bankruptcy process for this potentially strategic asset. And we are seeking board approval to invest up to an incremental one hundred million to purchase securities necessary to gain control of the unsecured impaired class," in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| Approximately Spring to Summer 2009 | Ergen | DISH board | Ergen used the wires to state or cause to be stated, regarding DBSD that "[w]e believe there is a strategic opportunity to obtain the remaining convertible bonds outstanding in an attempt to convert to equity and acquire control of ICO North America. . . . We are seeking board approval for up to [$200M] to acquire the remaining convertible bonds outstanding and establish control of this strategic asset," in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| On or around July 2009 | Ergen and DISH | DISH's counsel, the parties, and the court | Ergen and DISH used the wires to instruct their counsel to send via electronic filing an objection to a DBSD plan in which counsel stated that DISH was a "model bankruptcy citizen" and that "it has not moved to |

| Table 1 Acts of Wire and Mail Fraud | | | |
|---|---|---|---|
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | | terminate exclusivity, and it has not proposed a competing plan," despite the fact that it was planning to and did in fact do both of these soon after, in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| On or around July 6, 2009 | Ergen and DISH | Canparthers Investments IV, LLC, HB Regas, Inc., and Special Situations Investing | Ergen and DISH used the wires to instruct either through counsel or directly the former holders of DBSD's first lien claims to make objections to the DBSD plan as a condition precedent to DISH and Ergen's purchase of those claims, and those holders foreseeably did use the wires to object to the DBSD plan, in furtherance of Ergen and DISH's fraudulent scheme to acquire DBSD's assets. |
| July 9, 2009 | Ergen and DISH | Canparthers Investments IV, LLC, HB Regas, Inc., and Special Situations Investing Group, Inc. | Ergen and DISH used the wires to purchase the first lien debt of DBSD in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| On or around September 21, 2009 | Ergen and DISH | DISH's counsel, the parties, and the court | Ergen and DISH used the wires to instruct their counsel to send via electronic filing a motion to terminate DBSD's exclusivity period and for authority to propose a competing plan in furtherance of their fraudulent scheme to acquire DBSD's assets. |
| November 2009 | Ergen and DISH | DBSD parties and court | Ergen and DISH used the wires to seek to terminate the exclusivity period in furtherance of their fraudulent scheme to obtain DBSD's assets. |
| Various dates from June 2011 through April 13, 2012 | Thomas Cullen (DISH) | Jason Kiser & Charles Ergen | Cullen used the wires to monitor news stories related to LightSquared and reported on those events to Ergen and Kiser. |
| Fall 2011 | Charles Ergen | Jason Kiser (DISH) | At Ergen's request, through the use of the wires, Kiser compiled information on LightSquared's spectrum and capital structure, which he shared with Ergen. |
| Fall 2011 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser at Ergen's request, used the wires to retain Sound Point to facilitate purchases of the LP Debt and asked Sound Point's founder, Ketchum if DISH was permitted to purchase the LP Debt. |
| Fall 2011 | Jason Kiser (DISH) | Sullivan & Cromwell (Counsel to | Kiser used the wires to consult with Sullivan and Cromwell LLP in New York to determine whether DISH could purchase the LP Debt. |

| Table 1 Acts of Wire and Mail Fraud | | | |
|---|---|---|---|
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | DISH) | |
| Fall 2011 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to ask the Sound Point Defendants to monitor the prices and volume of the LP Debt despite the transfer restrictions, and Sound Point communicated the information to Kiser via the wires. |
| November 14, 2011 | Jason Kiser (DISH) | Mark Jackson (EchoStar) | Kiser had Mark Jackson, the President of EchoStar Technologies L.L.C. sign and mail a non-disclosure agreement with Jefferies related to acquiring confidential information about LightSquared. |
| December 21, 2011 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to instruct the Sound Point Defendants to create new special purpose vehicle to purchase the LP Debt |
| Early 2012-May 14, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Throughout early 2012, Ketchum used the wires to keep Kiser apprised of LightSquared's progress towards bankruptcy. |
| February 20, 2012 | Thomas Cullen (DISH) | Jason Kiser (DISH) & Charles Ergen | On February 20, 2012 Cullen emailed to Ergen and Kiser enclosing an article on LightSquared's default on $56 million payment to Inmarsat, monitoring for an opportunity to execute the Fraudulent Scheme. |
| Various dates from April 13, 2012 through April 26, 2013 | The Sound Point Defendants on behalf of the RICO Enterprise | UBS | SPSO repeatedly used the wires to deceitfully and illegally acquire the LP Debt by representing that it was an "Eligible Assignee" in each Assignment and Assumption agreement that SPSO submitted to UBS in connection with its LP Debt purchases and specifically identified individuals to receive confidential information. |
| Various dates from April 13, 2012 through May 21, 2013 | Mark Hootnick (Moelis) | Rachel Strickland (Willkie) | Counsel for SPSO at the implicit or explicit instruction of Ergen via the wires was instructed to conceal, by use of the wires, Ergen's involvement from LightSquared's financial advisor Hootnick. |
| Various dates from April 13, 2012 through April 26, 2013 | Jason Kiser (DISH and SPSO) & Stephen Ketchum (Sound Point) | Various trade counterparties | At the instruction via the wires of Kiser, Sound Point and Ketchum repeatedly used the wires to make misrepresentations and rebuff requests by SPSO's counterparties to settle the hundreds of millions of dollars in open LP Debt trades. |
| Various dates from April 13, 2012 through April 26, 2013 | Jason Kiser (DISH) | Bear Creek Asset Management | With the closing of each trade, Kiser used the wires to contact Bear Creek to tell it how much money was needed to close the trade, and at the behest of Ergen, Bear Creek, as Defendants could foresee, used the wires to liquidate investments and wire the funds to |

| Table 1 | | | |
|---|---|---|---|
| **Acts of Wire and Mail Fraud** | | | |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | | Sound Point. |
| April 17, 2012 | Steven Ketchum (Sound Point) | Jason Kiser (DISH) | On April 17, 2012, in connection with executing the purchases of LP Debt, Ketchum emailed Kiser that, "[w]e need to get the Citi account open for BH Holdings and get $500,000 in the account before we do any more LightSquared trades." |
| April 27, 2012 | Thomas Cullen (DISH) | Jason Kiser (DISH) | Cullen emailed Kiser enclosing a *Wall Street Journal* article discussing bankruptcy as an imminent possibility, monitoring for an opportunity to execute the Fraudulent Scheme. |
| April 30, 2012 | Jason Kiser (DISH) | Charles Ergen | Kiser emailed Ergen enclosing *Wall Street Journal* article discussing Mr. Falcone's attempt to get a one week "extension on default," monitoring for an opportunity to execute the Fraudulent Scheme. |
| May 2, 2012 | Stephen Ketchum (Sound Point) | Sound Point | Ketchum used the wires to arrange for purchases of LP Debt on behalf of SPSO and coordinate with another Sound Point employee to ensure that SPSO's identity remain secret. |
| May 3, 2012 | Sound Point | Stephen Ketchum (Sound Point) | Sound Point employees used the wires to discuss the risk of Ergen's identity being revealed through Bal Harbour's trade documentation. |
| May 4, 2012 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires, at Ergen's instructions, to direct Ketchum to vote no on the extension for negotiations to avoid LightSquared's bankruptcy per Ergen's instructions, which direction Ketchum executed via the wires. |
| May 5, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to strategize with Kiser with regard to inquiries from the press concerning SPSO's LP Debt purchases. |
| May 7, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to strategize with Kiser with regard to inquiries from the press concerning SPSO's LP Debt purchases, and rumors that Ergen was behind those purchases. |
| May 9, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to notify Kiser that DISH and others had been added to the Disqualified Company list of the Credit Agreement, but that Ergen personally had not been named. |
| May 10, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to notify Kiser that the definition of "Disqualified Company" in the Credit Agreement included "any known subsidiary thereof." |
| May 2012 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to direct the Sound Point Defendants to create new SPVs to replace Bal |

| Table 1 Acts of Wire and Mail Fraud | | | |
|---|---|---|---|
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | | Harbour after realizing Bal Harbour could be traced back to Colorado. |
| May 11, 2012 | Stephen Ketchum (Sound Point) | Jason Kiser (DISH) | Ketchum used the wires to suggest to Kiser that the new entity's name be SP Special Opportunities, LLC – a name suggesting Sound Point ownership. |
| May 16, 2012 | Jason Kiser (DISH) | The Sound Point Defendants | Kiser used the wires to direct the Sound Point Defendants to set up SPSO and SO Holdings. |
| May 2012 | Jason Kiser (DISH) | Charles Ergen | Kiser, Ketchum, and Ergen used the wires to strategize on how best to conceal the source of the trades, with Ketchum stating that [t]here might just be a lot of people fishing all over the place based on speculation (they're [sic] weren't a lot of other logical buyers)." |
| October 4, 2012 | Charles Ergen | Jason Kiser (DISH) | Ergen used the wires to direct Kiser to purchase LP Debt sufficient to establish a blocking position for SPSO. |
| December 6, 2012 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to preliminarily and deceptively propose an acquisition of certain of Clearwire's spectrum assets in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| December 12, 2012 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively propose an acquisition of certain of Clearwire's spectrum assets in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| December 28, 2012 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised non-binding proposal for an acquisition of certain of Clearwire's spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| January 11, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised non-binding proposal for an acquisition of certain of Clearwire's spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| February 8, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised non-binding proposal for an acquisition of certain of |

| Table 1 | | | |
|---|---|---|---|
| **Acts of Wire and Mail Fraud** | | | |
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | | Clearwire's spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| February 25, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires or mail to deceptively present a revised highly conditional proposal for an acquisition of certain of Clearwire's spectrum assets and illegal tender offer for Clearwire's stock to induce stockholders into voting down the merger in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| Various dates from January 14, 2013 to May 9, 2013 | Sound Point | UBS | Sound Point made repeated misrepresentations through the wires to SPSO's trade counterparties in order to delay closing on SPSO's LP Debt trades. |
| February 12, 2013; April 4, 2013 | Sound Point | Stephen Ketchum (Sound Point) | Sound Point employees used the wires to strategize on how to achieve stalking horse bidder status for Ergen. |
| April 25, 2013 | The Sound Point Defendants | Jefferies | Sound Point used the wires to conceal the reason for delayed trades to Jefferies. |
| April-May 2013 | The Sound Point Defendants | Jefferies | Sound Point used the wires to falsely claim to Jefferies that they are "still waiting on the funds" as a pretext for intentionally delaying the closure of trades. |
| Various dates from May 2013 onward | The RICO Enterprise | The RICO Enterprise | The RICO Enterprise used the wires to conspire to conceal the Valuation Materials. |
| May 2, 2013 | Charles Ergen | DISH Board of Directors | Ergen used the wires to transmit a presentation to DISH setting forth his strategy for acquiring LightSquared's assets using as leverage his recent acquisition of significant amounts of LP Debt and LP Preferred Equity in breach of their governing agreements. |
| May 23-29, 2013 | Charles Ergen and DISH | Clearwire | DISH and Ergen used the wires to secretly acquire shares of Clearwire stock in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| May 29, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires and mail to deceptively present an illegal tender offer for Clearwire in furtherance of their fraudulent scheme to acquire Clearwire's spectrum |

| DATE | FROM | TO | DESCRIPTION |
|------|------|-----|-------------|
| **Table 1** **Acts of Wire and Mail Fraud** | | | |
| | | | assets. |
| June 12, 2013 | Charles Ergen and DISH | Clearwire | Ergen and DISH used the wires and mail to deceptively extend their illegal tender offer for Clearwire in furtherance of their fraudulent scheme to acquire Clearwire's spectrum assets. |
| June 2013 | The RICO Enterprise | The RICO Enterprise | In June 2013, the RICO Enterprise conspired, using the wires, to join the Ad Hoc Secured Group to avoid termination of the exclusivity period, after frustrating its provisions, in violation of the Exclusivity Order. |
| June-July 2013 | The RICO Enterprise | The Ad Hoc Secured Group | The RICO Enterprise induced the Ad Hoc Secured Group to negotiate a plan based on the RICO Enterprise's misrepresentations regarding the viability and intent to consummate the Stalking Horse Bid. |
| June-September 2013 | The RICO Enterprise | Willkie | The RICO Enterprise instructed counsel via use of the wires to argue that Harbinger was conflicted, and counsel used the wires to repeat this misrepresentation to the parties and the Bankruptcy Court. |
| June-September 2013 | The RICO Enterprise | Harbinger, LightSquared, the Ad Hoc Secured Group, the parties to the Bankruptcy Court | The RICO Enterprise used the wires to misrepresent that Harbinger was conflicted. |
| July 3, 2013 | Charles Ergen | Steve Goodbarn (Special Committee) & Gary Howard (Special Committee) & David Moskowitz (DISH) | On July 3, 2013, Ergen used the wires to transmit to Messrs. Goodbarn, Howard, and David Moskowitz, an in-house attorney and a Senior Vice President for DISH and EchoStar the Ergen July 8 Presentation setting forth the true value of LightSquared's assets. |
| July 9, 2013 | SPSO | Harbinger | On July 9, 2013, SPSO, at the direction of Ergen via the wires, used the wires the "SPSO Stipulation" stating that "the timing of closing of each of SPSO's acquisitions of Prepetition LP Obligations was primarily driven by the sellers of such claims." A prior July 3, 2013 stipulation, which was modified and amended by the SPSO Stipulation, had stated that "SPSO's trade counterparties did not request that SPSO settle or close the trades for several months" and that "SPSO and Ergen took no |

| Table 1 Acts of Wire and Mail Fraud | | | |
|---|---|---|---|
| **DATE** | **FROM** | **TO** | **DESCRIPTION** |
| | | | action to delay" the closing of any of the trades. |
| July 9, 2013 | SPSO | Harbinger | SPSO further represented "LightSquared [was not] governed by a typical, non-conflicted fiduciary. . . . Were a non-conflicted fiduciary in charge of the LP estates, litigation and protracted negotiations would not have been required to induce the LP Debtors to maximize the value of its estates for the benefit of their stakeholders." |
| Various dates through July 23, 2013 | The Sound Point Defendants | Ergen, DISH, LBAC, and SPSO | The Sound Point Defendants used the wires to advise the RICO Enterprise about placing the LBAC and Stalking Horse Bids in furtherance of the Fraudulent Scheme. |
| July 2013 | SPSO | Charles Ergen | SPSO instructed Ergen to sell LBAC to DISH for $1. |
| July 23, 2013 | DISH | | On July 23, 2013, DISH used the wires to announce its intention to place the Stalking Horse Bid. |
| July 23, 2013 | DISH | | On July 23, 2013, DISH used the wires to announce that it had executed a Plan Support Agreement, pursuant to which LBAC would act as the stalking horse bidder. |
| August 6, 2013 | Charles Ergen | | Ergen used the wires during a DISH earnings call to state that the Stalking Horse Bid was beneficial to DISH such that DISH intended to pursue it. |
| Fall 2013 | Charles Ergen, SPSO | Steven Zelin (Blackstone) | Counsel for SPSO, used the wires, at Ergen and SPSO's instructions via the wires, to warn LightSquared's financial advisor, Zelin, that Ergen would walk away from the bid if there were no other bidders, to gain further leverage in negotiations with LightSquared. |
| January 9, 2014 | DISH LBAC | The Ad Hoc Secured Group | DISH, by use of the wires, terminated the bid falsely citing a purported "technical issue." |

162.    During the Relevant Period, Defendants also engaged in bankruptcy fraud as codified in 18 U.S.C. § 152.  At the direction of the DISH Defendants, Sound Point and Ketchum purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order requiring good faith negotiations and then SPSO later joined the Ad Hoc Secured Group to preserve its majority and uphold the sale provisions, violating the Exclusivity Order.

Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and made false oaths or accounts in the Adversary Proceeding, when they lied under oath during critical trial testimony concerning *inter alia*:  (i) the reasons for delaying the closing of the LP Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii) Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

163.    Defendants obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503.  With the intent of interfering with critical plan negotiations, and driving wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the adequacy of the LBAC and Stalking Horse Bids to influence the Bankruptcy Process.  Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the Adversary Proceeding.  During the course of the Bankruptcy Proceeding, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony."  Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding Ergen and Kiser's LP

Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

164.    Each of the instances of mail and wire fraud, bankruptcy fraud, and obstruction of justice detailed in this Complaint constitutes a predicate act of racketeering activity because each act furthered and executed the Fraudulent Scheme.

165.    It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in, and conduct activities that affected, interstate commerce.  The pattern of racketeering consisted of multiple acts of racketeering by each of Defendants.  The activities of the RICO Enterprise were interrelated, not isolated, and were perpetrated for the same or similar purposes.  The activities extended for several years, up to the at least the termination of the LBAC bid in January 2014.

166.    Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of 18 U.S.C. §1962(c), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.  Defendants' misconduct directly caused Harbinger's injury by: depriving Harbinger of its bargained for rights under the Stockholders' Agreement, including in particular, its ability to appoint and remove a majority of LightSquared's board, ability to designate and chair committees, and direct certain management decisions.

167.    As a result of the actions undertaken by and among Defendants to violate 18

U.S.C. § 1962(c), pursuant to 18 U.S.C. §1964(c), Harbinger is entitled to recover treble its

general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by

reason of Defendants' violations of 18 U.S.C. § 1962(c) and, accordingly, is further entitled to a

judgment against Defendants in excess of $500 million.

**SECOND CAUSE OF ACTION**
**RACKETEERING VIOLATION OF 18 U.S.C. § 1962(d)**
**(AGAINST ALL DEFENDANTS)**

168.    Plaintiffs restate each and every allegation of paragraphs 1 through 167 as if fully

set forth herein.

169.    During the Relevant Period, Defendants knowingly conspired together to violate

18 U.S.C. § 1962(c) through the conduct, or participation -- directly or indirectly -- in the

conduct, of an RICO Enterprise through a pattern of racketeering activity within the meaning of

18 U.S.C. §§ 1961(1) and (5), and 1962(c) and (d).

170.    In furtherance of the conspiracy and to effectuate its objectives, each of

Defendants agreed that the following predicate acts, among others, would be committed by one

or more of the members of the conspiracy:  wire fraud in violation of 18 U.S.C. § 1343,

bankruptcy fraud in violation of 18 U.S.C. § 152, and obstruction of justice in violation of 18

U.S.C. § 1503.

171.    Specifically, the Defendants agreed to use wire fraud, among other things, to:

(i) acquire DBSD's spectrum assets and the LP Debt in bad faith; (ii) track LightSquared's

movement towards bankruptcy as a possible acquisition target for LightSquared; (iii) form the

undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal the true source of the LP

Debt purchases to circumvent the transfer restrictions in the Credit Agreement; (iv) purchase the

LP Debt for the benefit of a Disqualified Company under the Credit Agreement; (v) act as a

competitor rather than an ordinary creditor in voting against an amendment that would have allowed LightSquared to avoid bankruptcy; (vi) make the LBAC and Stalking Horse Bids for LightSquared's assets for far less than they are worth to influence the Chapter 11 process and gain the allegiance of the Ad Hoc Secured Group; (vii) conceal and misrepresent the sufficiency of the LBAC and Stalking Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip Harbinger of its contractual right to control LightSquared's board and committees; and (viii) terminate the LBAC Bid under false pretenses in order to obtain an even lower price for LightSquared's assets for DISH.

172.    The Defendants also agreed to use bankruptcy fraud, among other things, to: (i) purposefully delay the closing of trades and join the Ad Hoc Secured Group; (ii) file false misrepresentations in the Bankruptcy Court; (iii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; (iv) lie under oath during critical trial testimony during the Bankruptcy Proceeding; and (v) violate the Exclusivity Order.

173.    Additionally, the Defendants agreed to use obstruction of justice, among other things, to: (i) delay the closing of trades and then later join the Ad Hoc Secured Group to interfere with Harbinger's relationship with the Ad Hoc Secured Group and create a false appearance of conflict; (ii) provide false testimony in the Bankruptcy Proceeding, including regarding the existence of a conflict; (iii) fail to produce material documents, including the Valuation Materials, in that proceeding; (iv) make false statements about the validity of the LBAC and Stalking Horse Bids to influence the Chapter 11 process; and (v) violate the Exclusivity Order.

174. These predicate acts were performed at the direction of, and/or were foreseeable to, Defendants, and conducted for the purpose of using subterfuge, deceit, misinformation, and dishonest means to acquire LightSquared's spectrum assets.

175. Defendants committed and caused to be committed a series of overt predicate acts of racketeering in furtherance of the conspiracy, including but not limited to the acts described in this Complaint. The racketeering activity of the RICO Enterprise consisted of multiple, related acts perpetrated during the Relevant Period that are within the scope of 18 U.S.C. §1961(1)(B) and (5).

176. The Defendants acted in violation of the federal wire fraud statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in furtherance of a scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence from bankruptcy in order to purchase its spectrum assets at below market value. It was reasonably foreseeable that the wires would be used to execute the Fraudulent Scheme. As the RICO Enterprise's goal was to obtain LightSquared's valuable spectrum rights and deprive Harbinger of its rights under the Stockholders' Agreement, the Scheme involved money or property as its object. As detailed in Table 1 above, each of Defendants engaged in multiple acts of wire fraud to: (i) foster the creation of SPVs to be used as subterfuge to acquire the LP Debt; (ii) deceitfully represent that SPSO was an Eligible Assignee of the LP Debt when in fact, its purchases were undertaken to benefit Disqualified Companies; (iii) communicate with counterparties to the LP Debt purchases or their representatives, and as part of those communications, use deceit to disguise that SPSO's purchases of the LP Debt were for the benefit of LightSquared's competitor, DISH; (iv) monitor and execute improper trades of the LP Debt; (v) acquire a blocking position in the LP Debt to benefit a Disqualified Company; (vi) transfer funds to support the improper trades; (vii) submit

the LBAC and Stalking Horse Bids for LightSquared's assets in order to take advantage of SPSO's wrongfully-obtained blocking position and gain the support of the Ad Hoc Secured Group; (viii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; and (ix) withdraw that bid in an effort to destabilize the sale process and, ultimately, permit DISH to obtain LightSquared's assets at an even lower price. As there are numerous communications within the exclusive control of Defendants, which reveal Defendants' use of the mail and wires in furtherance of the Fraudulent Scheme, the Plaintiffs do not have access to all those communications.

177.    During the Relevant Period, Defendants also engaged in bankruptcy fraud as codified in 18 U.S.C. § 152.  At the direction of the DISH Defendants, Sound Point and Ketchum purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order requiring good faith negotiations and then SPSO later joined the Ad Hoc Secured Group to preserve its majority and uphold the sale provisions, violating the Exclusivity Order. Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and made false oaths or accounts in the Adversary Proceeding, when they lied under oath during critical trial testimony concerning *inter alia*:  (i) the reasons for delaying the closing of the LP Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii) Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC

and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

178. The Defendants also obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503. With the intent of interfering with critical plan negotiations, and driving wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the adequacy of the LBAC and Stalking Horse Bids to influence the Bankruptcy Process. Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the Adversary Proceeding. During the course of the Bankruptcy Proceeding, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony." Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding Ergen and Kiser's LP Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids.

179. It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in, and conduct activities that affected, interstate commerce. The pattern of racketeering consisted of multiple acts of racketeering by each of Defendants. The activities of the RICO Enterprise were interrelated, not isolated, and were perpetrated for the same or similar

purposes.  The activities extended for several years, up to the at least the termination of the LBAC bid in January 2014.

180.    Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of 18 U.S.C. §1962(d), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.

181.    As a direct result of the conspiracy by and among Defendants to violate 18 U.S.C. § 1962(c), and thus 18 U.S.C. § 1962(d) as well, Harbinger has suffered substantial damages in an amount to be proven at trial, but which exceed $500 million.  Pursuant to 18 U.S.C. §1964(c), Harbinger is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of  18 U.S.C. § 1962(d) and, accordingly, are further entitled to a judgment against Defendants in excess of $500 million.

### THIRD CAUSE OF ACTION
### COLORADO ORGANIZED CRIME CONTROL ACT
### PURSUANT TO COLO. REV. STAT. § 18-17-104(3)
### (AGAINST ALL DEFENDANTS)

182.    Plaintiffs restate each and every allegation of paragraphs 1 through 181 as if fully set forth herein.

183.    Throughout the Relevant Period, each of the members of the RICO Enterprise were associated-in-fact and comprised an "enterprise" within the meaning of Colo. Rev. Stat. §§ 18-17-103(2) and 104(3).  Each of Defendant knowingly conducted and/or participated in the conduct of the COCCA Enterprise, as described in this Complaint, through a pattern of racketeering activity, as that phrase is defined in Colo. Rev. Stat. § 18-17-103(3).

184.    The common purpose of the Defendants' actions in furtherance of the RICO Enterprise was to use artifice, deceit, misinformation, and dishonest means to wrest away from

LightSquared the valuable wireless spectrum assets held by LightSquared while in bankruptcy, and strip Harbinger of the valuable rights it held pursuant to the Stockholders' Agreement.

185.    While operating outside of a unified corporate structure, each of Defendants DISH, SPSO, SO Holdings, and LBAC were, at some or all times during the Relevant Period, solely-owned or controlled by Defendant Ergen and each, along with Ketchum and Sound Point, engaged in a coordinated effort to use criminal and deceitful means to gain an unfair strategic advantage in the Bankruptcy Proceeding to acquire LightSquared's assets for DISH and deprive Harbinger of its contractual rights to maintain a majority of the board seats.  By displacing Harbinger from the LightSquared board, Harbinger was unable to stop the Defendants from influencing the Chapter 11 process with the goal of acquiring LightSquared's assets through wrongful means.  In exchange for fees from Ergen and the promise of a lucrative future business, the Sound Point Defendants knowingly engaged in conduct in furtherance of the RICO Enterprise by (i) executing LP Debt trades in furtherance of the scheme at the direction of the DISH Defendants; (ii) creating fronts to facilitate the illegal purchases of the LP Debt; (iii) assisting to manipulate the closing of hundreds of millions of LP Debt trades; (iv) communicating false and deceitful representations to counterparties and UBS; and (v) providing false testimony in the Bankruptcy Proceeding.

186.    The association-in-fact enterprise has had sufficient longevity to allow the Defendants to pursue the RICO Enterprise's purpose including through, among others, the following actions:   (1) acquiring DBSD's spectrum assets and the LP Debt in bad faith; (2) tracking LightSquared's movement towards bankruptcy as a possible acquisition target for DISH; (3) forming the undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal the true source of the LP Debt purchases to circumvent the transfer restrictions in the Credit

Agreement; (4) purchasing the LP Debt in breach of the Credit Agreement; (5) acting as a

competitor rather than an ordinary creditor in voting against an amendment that would have

allowed LightSquared to avoid bankruptcy; (6) making the LBAC and Stalking Horse Bids for

LightSquared's assets for far less than they are worth to gain the allegiance of the Ad Hoc

Secured Group; (7) concealing and misrepresenting the sufficiency of the LBAC and Stalking

Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip

Harbinger of its right to control LightSquared's board and committees; (8) terminating the

LBAC Bid under false pretenses in order to obtain an even lower price for LightSquared's assets

for DISH; and (9) obstructing justice in the Bankruptcy Proceeding through bankruptcy fraud,

violating the Exclusivity Order, lying under oath, misrepresenting to the Bankruptcy Court the

existence of a conflict by virtue of Harbinger's opposition to their "good faith bid," and

withholding material evidence.

     187.    As set forth above, while participating in the conduct of the RICO Enterprise,

Defendants have undertaken actions with the same or similar purposes, results, participants,

victims, and methods. DISH used the interstate mails and/or wires in furtherance of a deceitful

scheme to defeat a reorganization plan that would have permitted DBSD to emerge from

bankruptcy so that DISH could purchase DBSD's assets in liquidation for less than their fair

market value. With respect to LightSquared, the participants in the RICO Enterprise (which had

grown in size since the DBSD misconduct to include Ergen, SPSO, LBAC, Sound Point, and

Ketchum) also committed wire and mail fraud, bankruptcy fraud, and obstruction of justice to (a)

obtain a majority of LightSquared's LP Debt and thereby control of LightSquared's bankruptcy

proceeding and (b) strip Harbinger of its rights over LightSquared by making false bids for

LightSquared's assets and then claiming that Harbinger was in breach of its fiduciary duties by opposing the bids, despite knowing that the value of LightSquared's assets far exceeded the bids.

188. Defendants' misconduct carries the threat of continuing wrongdoing extending indefinitely into the future. DISH is in the business of, among other things, acquiring spectrum assets, including through the bankruptcy process, and admits that it will continue to acquire more spectrum assets in the future. As a matter of the routine conduct of their businesses, the DISH Defendants have engaged in systematic and ongoing misconduct of manipulating the bankruptcy process to acquire spectrum, including through the use of wire fraud, bankruptcy fraud, and obstruction of justice in the underlying bankruptcy proceedings. The Defendants have not yet succeeded with their scheme to acquire LightSquared's assets and continue to use deceitful and wrongful means to push LightSquared towards liquidation to acquire LightSquared's spectrum assets, and there is a substantial threat that these Defendants will continue these practices into the future beyond the LightSquared bankruptcy given their past practices and their admitted desire to acquire more spectrum assets.

189. Additionally, Defendants have engaged in a series of related acts of misconduct, including wire and mail fraud, bankruptcy fraud and obstruction of justice extending over several years. In furtherance of the RICO Enterprise, DISH first engaged in wire fraud during the summer of 2009 in furtherance of a scheme to wrongfully prevent DBSD from emerging from bankruptcy. Similarly, in December 2011, the DISH Defendants used the wires to communicate concerning the creation of Bal Harbour -- a front used to deceitfully and illegally purchase the LP Debt. Beginning in at least as early as January 2012, the DISH Defendants tracked LightSquared's progress in bankruptcy via the wires. Defendants thereafter engaged in a continuous series of actions constituting racketeering activity, including acts in violation of 18

U.S.C. § 1343 (wire fraud), 18 U.S.C. § 152 (bankruptcy fraud), and 18 U.S.C. § 1503

(obstruction of justice). These ongoing acts of malfeasance extend as least as far as January 7,

2014, when Defendant LBAC used the interstate wires to wrongfully terminate its bid for

LightSquared's assets in furtherance of Defendants' Scheme.

190. As set forth above, each Defendant acted in violation of the federal wire fraud

statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in

furtherance of a scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence

from bankruptcy in order to purchase its spectrum assets at below market value. As the RICO

Enterprise's goal was to obtain LightSquared's valuable spectrum rights and deprive Harbinger

of its valuable rights under the Stockholders' Agreement, the scheme involved money or

property as its object. It was reasonably foreseeable that the wires would be used to execute the

Fraudulent Scheme.

191. During the Relevant Period, Defendants also engaged in bankruptcy fraud as

codified in 18 U.S.C. § 152. At the direction of the DISH Defendants, Sound Point and Ketchum

purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order

requiring good faith negotiations and then SPSO later joined the Ad Hoc Secured Group to

preserve its majority and uphold the sale provisions, violating the Exclusivity Order.

Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and

made false oaths or accounts in the Adversary Proceeding, when they lied under oath during

critical trial testimony concerning *inter alia*: (i) the reasons for delaying the closing of the LP

Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations

during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote

against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii)

Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

192.    Defendants obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503. With the intent of interfering with critical plan negotiations, and driving wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the adequacy of the LBAC and Stalking Horse Bids to influence the Bankruptcy Process. Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the Adversary Proceeding. During the course of the Bankruptcy Proceeding, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony." Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding Ergen and Kiser's LP Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

193.    Each of the instances of mail and wire fraud, fraud on the Bankruptcy Court, and obstruction of justice detailed in this Complaint constitutes a predicate act of racketeering activity because each act furthered and executed the Fraudulent Scheme.

194.    It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in, and conduct activities that affected, interstate commerce. The pattern of racketeering consisted of multiple acts of racketeering by each of Defendants. The activities of the RICO Enterprise were interrelated, not isolated, and were perpetrated for the same or similar purposes. The activities extended for several years, up to the at least the termination of the LBAC bid in January 2014.

195.    Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of Colo. Rev. Stat. § 18-17-104(3) including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above. Defendants' misconduct directly caused Harbinger's injury by: depriving Harbinger of its bargained for rights under the Stockholders' Agreement, including in particular, its ability to appoint and remove a majority of LightSquared's board, ability to designate and chair committees, and direct certain management decisions.

196.    As a result of actions undertaken by and among Defendants to violate Colo. Rev. Stat. § 18-17-104(3), pursuant to Colo. Rev. Stat. § 18-17-106(7), Harbinger is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of Stat. § 18-17-104(3) and, accordingly, is further entitled to a judgment against Defendants in excess of $500 million.

**FOURTH CAUSE OF ACTION**
**COLORADO ORGANIZED CRIME CONTROL ACT**
**PURSUANT TO COLO. REV. STAT. § 18-17-104(4)**
**(AGAINST ALL DEFENDANTS)**

197.     Plaintiffs restate each and every allegation of paragraphs 1 through 196 as if fully set forth herein.

198.     During the Relevant Period, Defendants knowingly conspired together to violate Colo. Rev. Stat. § 18-17-104(4) through the conduct, or participation -- directly or indirectly -- in the conduct, of an enterprise through a pattern of racketeering activity within the meaning of Colo. Rev. Stat. § 18-17-104(3) and (4).

199.     In furtherance of the conspiracy and to effectuate its objectives, each of Defendants agreed that the following predicate acts, among others, would be committed by one or more of the members of the conspiracy: wire fraud in violation of 18 U.S.C. § 1343, bankruptcy fraud in violation of 18 U.S.C. § 152, and obstruction of justice in violation of 18 U.S.C. § 1503.

200.     Specifically, the Defendants agreed to use wire fraud, among other things, to: (i) acquire DBSD's spectrum assets and the LP Debt in bad faith; (ii) track LightSquared's movement towards bankruptcy as a possible acquisition target for LightSquared; (iii) form the undercapitalized entities, Bal Harbour and SPSO, to knowingly conceal the true source of the LP Debt purchases to circumvent the transfer restrictions in the Credit Agreement; (iv) purchase the LP Debt for the benefit of a Disqualified Company under the Credit Agreement; (v) act as a competitor rather than an ordinary creditor in voting against an amendment that would have allowed LightSquared to avoid bankruptcy; (vi) make the LBAC and Stalking Horse Bids for LightSquared's assets for far less than they are worth to influence the Chapter 11 process and gain the allegiance of the Ad Hoc Secured Group; (vii) conceal and misrepresent the sufficiency

of the LBAC and Stalking Horse Bids in order to claim that Harbinger was breaching its fiduciary duties and strip Harbinger of its contractual right to control LightSquared's board and committees; and (viii) terminate the LBAC Bid under false pretenses in order to obtain an even lower price for LightSquared's assets for DISH.

201.    The Defendants also agreed to use bankruptcy fraud, among other things, to: (i) purposefully delay the closing of trades and join the Ad Hoc Secured Group; (ii) file false misrepresentations in the Bankruptcy Court; (iii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; (iv) lie under oath during critical trial testimony during the Bankruptcy Proceeding; and (v) violate the Exclusivity Order.

202.    Additionally, the Defendants agreed to use obstruction of justice, among other things, to:  (i) delay the closing of trades and then later join the Ad Hoc Secured Group to interfere with Harbinger's relationship with the Ad Hoc Secured Group and create a false appearance of conflict; (ii) provide false testimony in the Bankruptcy Proceeding, including regarding the existence of a conflict; (iii) fail to produce material documents, including the Valuation Materials, in that proceeding; (iv) make false statements about the validity of the LBAC and Stalking Horse Bids to influence the Chapter 11 process; and (v) violate the Exclusivity Order.

203.    These predicate acts were performed at the direction of, and/or were foreseeable to, Defendants, and conducted for the purpose of using subterfuge, deceit, misinformation, and dishonest means to acquire LightSquared's spectrum assets.

204. Defendants committed and caused to be committed a series of overt predicate acts of racketeering in furtherance of the conspiracy, including but not limited to the acts described in this Complaint.

205. The Defendants acted in violation of the federal wire fraud statute (18 U.S.C. § 1343) when they used the interstate wires to engage in communications in furtherance of a scheme to use artifice, fraud, and deceit to prevent LightSquared's emergence from bankruptcy in order to purchase its spectrum assets at below market value. As the RICO Enterprise's goal was to obtain LightSquared's valuable spectrum rights and deprive Harbinger of its rights under the Stockholders' Agreement, the Scheme involved money or property as its object. It was reasonably foreseeable that the wires would be used to execute the Fraudulent Scheme. As detailed in Table 1 above, each of Defendants engaged in multiple acts of wire fraud to: (i) foster the creation of SPVs to be used as subterfuge to acquire the LP Debt; (ii) deceitfully represent that SPSO was an Eligible Assignee of the LP Debt when in fact, its purchases were undertaken to benefit Disqualified Companies; (iii) communicate with counterparties to the LP Debt purchases or their representatives, and as part of those communications, use deceit to disguise that SPSO's purchases of the LP Debt were for the benefit of LightSquared's competitor, DISH; (iv) monitor and execute improper trades of the LP Debt; (v) acquire a blocking position in the LP Debt to benefit a Disqualified Company; (vi) transfer funds to support the improper trades; (vii) submit the LBAC and Stalking Horse Bids for LightSquared's assets in order to take advantage of SPSO's wrongfully-obtained blocking position and gain the support of the Ad Hoc Secured Group; (viii) knowingly misrepresent the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee; and (ix) withdraw that bid in

an effort to destabilize the sale process and, ultimately, permit DISH to obtain LightSquared's assets at an even lower price. As there are numerous communications within the exclusive control of Defendants which reveal Defendants' use of the mail and wires in furtherance of the Fraudulent Scheme, the Plaintiffs do not have access to all those communications.

206. During the Relevant Period, Defendants also engaged in bankruptcy fraud as codified in 18 U.S.C. § 152. At the direction of the DISH Defendants, Sound Point and Ketchum purposefully delayed the closing of trades to interfere with the provision of the Exclusivity Order requiring good faith negotiations and then SPSO later joined the Ad Hoc Secured Group to preserve its majority and uphold the sale provisions, violating the Exclusivity Order. Additionally, Defendants knowingly and fraudulently made misrepresentations in filings and made false oaths or accounts in the Adversary Proceeding, when they lied under oath during critical trial testimony concerning *inter alia*: (i) the reasons for delaying the closing of the LP Debt trades, which were, in fact, purposely delayed in order to obstruct critical plan negotiations during LightSquared's exclusivity period; (ii) the circumstances surrounding SPSO's vote against a forbearance agreement that would have forestalled LightSquared's bankruptcy; (iii) Defendants' involvement in the manipulation of the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids and a purported conflict existing between Harbinger and LightSquared, requiring the appointment of the LightSquared Special Committee.

207. The Defendants also obstructed justice during the Bankruptcy Proceedings in violation of 18 U.S.C. § 1503. With the intent of interfering with critical plan negotiations, and driving wedge between Harbinger and the Ad Hoc Secured Group, Defendants purposefully delayed the closing of trades in LP Debt, violated the Exclusivity Order and misrepresented the

adequacy of the LBAC and Stalking Horse Bids to influence the Bankruptcy Process. Defendant DISH also failed to produce critical Valuation Materials until after the close of evidence in the Adversary Proceeding. During the course of the Bankruptcy Proceeding, in which each of them was a participant as a Defendant and/or a witness, Defendants, with the intent or purpose of influencing the outcome of the Adversary Proceeding in favor of Defendants in that proceeding, affirmatively lied, or presented one or more witnesses who lied, under oath and engaged in "a troubling pattern of noncredible testimony." Defendants' witnesses proffered false testimony under oath during the Adversary Proceeding and Bankruptcy Proceeding concerning (i) Ergen's motivation for purchasing the LP Debt and the circumstances surrounding Ergen and Kiser's LP Debt purchases; (ii) the reason for Ergen voting against a forbearance agreement in May 2012 that would forestall LightSquared's bankruptcy filing; (iii) Defendants' role in manipulating the closing of the LP Debt trades; (iv) Defendants' reasons for terminating the Stalking Horse Bid; and (v) the validity of the LBAC and Stalking Horse Bids.

208.    It was specifically intended and foreseen by Defendants that the RICO Enterprise would engage in, and conduct activities that affected, interstate commerce. The pattern of racketeering consisted of multiple acts of racketeering by each Defendant. The activities of Defendants were interrelated, not isolated, and were perpetrated for the same or similar purposes by the same persons. The activities extended for several years, up to the at least the termination of the LBAC bid in January 2014.

209.    Harbinger has been injured in its business and property as a direct and proximate cause of Defendants' violations of Colo. Rev. Stat. § 18-17-104(4), including injury by reason of the predicate acts constituting the pattern of racketeering activity set forth above.

210. As a direct result of the conspiracy by and among Defendants to violate Colo. Rev. Stat. § 18-17-104(3), and thus Colo. Rev. Stat. § 18-17-104(4) as well, Harbinger has suffered substantial damages in an amount to be proven at trial, but which exceed $500 million. Pursuant to Colo. Rev. Stat. § 18-17-106(7), Harbinger is entitled to recover treble its general and special compensatory damages, plus interest, costs, and attorneys' fees incurred by reason of Defendants' violations of Colo. Rev. Stat. § 18-17-104(4) and, accordingly, are further entitled to a judgment against Defendants in excess of $500 million.

### FIFTH CAUSE OF ACTION
### TORTIOUS INTERFERENCE WITH CONTRACT
### (AGAINST THE DISH DEFENDANTS, LBAC, SPSO, AND SOH)

211. Plaintiffs restate each and every allegation of paragraphs 1 through 210 as if fully set forth herein.

212. On November 12, 2010, LightSquared and Harbinger entered into the Stockholders' Agreement. As alleged herein, pursuant to the Stockholder's Agreement, among LightSquared and its shareholders, including Harbinger, Harbinger is granted Harbinger had a right to: (i) appoint and remove the majority of the LightSquared board; (ii) designate committee members; (iii) chair committees; and (iv) approve critical management business decisions through its board votes. Additionally, LightSquared is forbidden from entering into any agreement that violates the rights granted to Harbinger.

213. At all relevant times, the DISH Defendants, LBAC, SPSO and SOH were aware and in possession of the Stockholders' Agreement and Harbinger's rights thereto. Indeed, the above-listed Defendants repeatedly expressed their desire to the Bankruptcy Court to remove Harbinger's influence over LightSquared.

214. As alleged herein, Defendants intentionally and improperly -- by way of wrongful means, amounting to criminal and tortious acts, or at very least lawful acts performed in an

unlawful manner, and maliciously and without economic justification -- interfered with Harbinger's rights pursuant to the Stockholders' Agreement, preventing LightSquared from performing thereunder and causing it to be breached and impossible to perform. Specifically, the above-listed Defendants, as alleged herein, (a) made material misrepresentations to LightSquared, the parties, and the Court, regarding (i) the good faith nature of their bids for LightSquared's assets, and (ii) Harbinger's ability to independently exercise its rights under the Stockholders' Agreement; (b) obstructed justice in the bankruptcy proceeding; (c) committed mail and wire fraud; (d) committed bankruptcy fraud; and (e) committed acts of racketeering.

215.    Harbinger has been harmed by the above-listed Defendants' wrongdoing. Because of Defendants' actions, LightSquared has breached and rendered performance impossible of the Stockholders' Agreement and Harbinger has lost its rights pursuant thereto, including its ability to appoint a majority of LightSquared's directors, dictate material management decisions, negotiate with the FCC, and appoint and chair committees.

216.    But for the above-listed Defendants' concerted and fraudulent acts, there would have been no resulting injury to Harbinger.

217.    By reason of the foregoing, Harbinger is entitled to a judgment against the above-listed Defendants, jointly and severally, for damages in an amount to be determined at the trial, but in excess of $500 million.

### SIXTH CAUSE OF ACTION
### ABUSE OF PROCESS
### (AGAINST THE DISH DEFENDANTS, LBAC, SPSO, AND SOH)

218.    Plaintiffs restate each and every allegation of paragraphs 1 through 217 as if fully set forth herein.

219.    On May 15, 2013 and July 23, 2013, LBAC, in cooperation with the DISH Defendants, SPSO, and SOH, deliberately and intentionally interfered with the Bankruptcy

Proceedings by making the below-market LBAC and Stalking Horse Bids for LightSquared's spectrum assets. The DISH Defendants, LBAC, SPSO, and SOH knew that these bids would interfere with Harbinger's efforts to restructure the LightSquared entities in an equitable manner.

220. The intended purpose of these bids never was to acquire the assets at this price, which is the proper legal purpose for making bids in bankruptcy proceedings. Indeed, none of the above-listed Defendants ever intended to honor the bids. And for this reason, these Defendants set a facially unreasonable time frame to consider the LBAC Bid (made while LightSquared's exclusivity period was still in effect) and withdrew the Stalking Horse Bid soon after it was made for reasons that were pretextual. Thus, the bids were made without excuse or justification.

221. Rather, the principal reason for the above-listed Defendants' actions was to improperly create a division between Harbinger and the Ad Hoc Secured Group, which would facilitate a scheme to deceive the Bankruptcy Court into wrongfully divesting Harbinger of its valuable control rights under the Stockholders' Agreement, conveying a collateral advantage to Defendants.

222. To further this scheme, Defendants willfully acted improperly in the Bankruptcy Proceedings and issued process by making repeated misrepresentations and omissions to the Bankruptcy Court, including related to Harbinger's purported conflict in opposing the LBAC and Stalking Horse Bids, withholding the Valuation Materials that conclusively established that Harbinger was not conflicted and that the LBAC and Stalking Horse Bids were undervalued, and filing a specious and baseless motion seeking leave to assert claims on behalf of the Debtors' estates against Mr. Falcone. These misrepresentations, omissions, withholding of documents and

baseless filing were done without excuse or justification and intended to displace Harbinger from LightSquared's board to enable the Defendants to accomplish their Fraudulent Scheme.

223. Because of Defendants' actions, Harbinger has been harmed by the usurpation and breach of the valuable rights secured by the Stockholders' Agreement, including its ability to appoint a majority of LightSquared's directors, dictate material management decisions, negotiate with the FCC, and appoint and chair committees.

224. But for the Defendants' improper acts in the Bankruptcy Proceedings, which were undertaken to accomplish an end utterly inappropriate and unrelated to the purposes of bankruptcy, there would have been no resulting injury to Harbinger.

225. By reason of the foregoing, Harbinger is entitled to a judgment against the above-listed Defendants, jointly and severally, for damages in an amount to be determined at the trial, but in excess of $500 million.

## DEMAND FOR JURY TRIAL

Harbinger demands a trial by jury on all issues and claims so triable.

## PRAYER FOR RELIEF

A. On the First and Second Causes of Action, directing Defendants to pay treble damages to Plaintiffs, plus interest, costs, and attorneys' fees, in an amount to be determined at trial, but which exceed $1.5 billion;

B. On the Third and Fourth Causes of Action, directing Defendants to pay treble damages to Plaintiffs, plus interest, costs, and attorneys' fees, in an amount to be determined at trial, but which exceed $1.5 billion;

C. On the Fifth Cause of Action, directing Defendants to pay damages to Plaintiffs, plus interest, cost, and attorneys' fees, in an amount to be determined at trial, which exceed $500 million;

D.     On the Sixth Cause of Action, directing Defendants to pay damages to Plaintiffs, plus interest, cost, and attorneys' fees, in an amount to be determined at trial, which exceed $500 million;

E.     Awarding Plaintiff pre- and post-judgment interest at the rate allowed by law; and

F.     Such other and further relief as this Court deems appropriate.

Dated:  July 8, 2014                                     Respectfully submitted,

                                                        */s/ Jason M. Lynch*
                                                        Daniel M. Reilly
                                                        Jason M. Lynch
                                                        Patrick Withers
                                                        REILLY POZNER LLP
                                                        1900 Sixteenth Street, Ste. 1700
                                                        Denver, CO 80202
                                                        Telephone: 303-893-6100
                                                        Facsimile: 303-893-6110
                                                        jlynch@rplaw.com

                                                        Marc E. Kasowitz
                                                        David M. Friedman
                                                        Christine A. Montenegro
                                                        Paul J. Burgo
                                                        KASOWITZ, BENSON, TORRES,
                                                          & FRIEDMAN LLP
                                                        1633 Broadway
                                                        New York, New York 10019
                                                        Telephone: (212) 506-1700
                                                        Facsimile: (212) 506-1800
                                                        mkasowitz@kasowitz.com

                                                        *Attorneys for Plaintiffs Harbinger Capital*
                                                        *Partners LLC, HGW US Holding Company*
                                                        *LP, Blue Line DZM Corp., and Harbinger*
                                                        *Capital Partners SP, Inc.*