**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 14-cv-1907-WJM-KMT

HARBINGER CAPITAL PARTNERS LLC,
HGW US HOLDING COMPANY LP,
BLUE LINE DZM CORP., and
HARBINGER CAPITAL PARTNERS SP, INC.,

       Plaintiffs,

v.

CHARLES W. ERGEN,
DISH NETWORK CORPORATION,
L-BAND ACQUISITION LLC,
SP SPECIAL OPPORTUNITIES LLC,
SOUND POINT CAPITAL MANAGEMENT LP, and
STEPHEN KETCHUM,

       Defendants.

---

## ORDER GRANTING MOTION TO DISMISS

---

Plaintiffs Harbinger Capital Partners LLC, HGW US Holding Company LP, Blue Line DZM Corp., and Harbinger Capital Partners SP, Inc. (collectively, "Harbinger") invested heavily in a company named LightSquared, which was building a nationwide wireless broadband network.  (ECF No. 1 ¶ 4.)  Harbinger brings suit against the following individuals and entities, to whom the Court will refer collectively as "Defendants": Charles W. Ergen ("Ergen"), DISH Network Corporation ("DISH"), L-Band Acquisition LLC ("LBAC"), SP Special Opportunities LLC ("SPSO"), Sound Point Capital Management LP ("Sound Point"), and Stephen Ketchum  ("Ketchum").  Harbinger claims that Defendants engaged in wire fraud, mail fraud, and other unlawful acts to disrupt

Harbinger's control of LightSquared during LightSquared's proceedings in the U.S.

Bankruptcy Court for the Southern District of New York ("Bankruptcy Court").  (*See*

*generally* ECF No. 1.)  Harbinger therefore asserts a civil cause of action under the

Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, and

various related claims.  (*Id*.)

Before the Court is Defendants' Motion to Dismiss the Complaint ("Motion").

(ECF No. 39.)  For the reasons stated below, the Court agrees with Defendants that this

lawsuit violates the prohibitions on claim-splitting and collateral attacks, and the Motion

is therefore granted.

## I.  LEGAL STANDARD

Defendants bring their Motion largely under Federal Rule of Civil Procedure

12(b)(6).  Under Rule 12(b)(6), a party may move to dismiss a claim in a complaint for

"failure to state a claim upon which relief can be granted."  The Rule 12(b)(6) standard

requires the Court to "assume the truth of the plaintiff's well-pleaded factual allegations

and view them in the light most favorable to the plaintiff."  *Ridge at Red Hawk, LLC v.*

*Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).  In ruling on such a motion, the

dispositive inquiry is "whether the complaint contains 'enough facts to state a claim to

relief that is plausible on its face.'"  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007)).  Granting a motion to dismiss "is a harsh remedy which must be

cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but

also to protect the interests of justice."  *Dias v. City & Cnty. of Denver*, 567 F.3d 1169,

1178 (10th Cir. 2009) (internal quotation marks omitted).  "Thus, 'a well-pleaded

complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

In this case, both parties have extensively referred to, quoted from, or attached various filings and orders from the Bankruptcy Court.  The Court may consider these materials without converting the motion to dismiss to one for summary judgment.  *See Pace v. Swerdlow*, 519 F.3d 1067, 1072–73 (10th Cir. 2008) (district court properly took judicial notice of other courts' records); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (district court may take judicial notice of "facts which are a matter of public record" without converting a Rule 12(b)(6) motion into a summary judgment motion).

## II.  FACTUAL BACKGROUND

This dispute already has a long history in the Bankruptcy Court, much of which is set forth in detail in the Bankruptcy Court's published orders: *In re LightSquared Inc.*, 504 B.R. 321 (Bankr. S.D.N.Y. 2013) ("*LightSquared I*"); *In re LightSquared Inc.*, 511 B.R. 253 (Bankr. S.D.N.Y. 2014) ("*LightSquared II*"); and *In re LightSquared Inc.*, 513 B.R. 56 (Bankr. S.D.N.Y. 2014) ("*LightSquared III*").  The following facts appear sufficient to resolve the Motion.

### A.    Harbinger and LightSquared

Harbinger owns about 82% of LightSquared, which is in the business of building a new nationwide broadband wireless network.  (ECF No. 1 ¶¶ 44–45.)  LightSquared and its shareholders (including Harbinger) are parties to a Stockholders' Agreement that grants "expansive rights" to Harbinger in light of Harbinger's significant investment.

(*Id.* ¶¶ 46–48.)  Harbinger claims that its contractual rights to "control LightSquared have a value independent of, and incremental to, the value of Harbinger's equity interests."  (*Id.* ¶ 48.)

LightSquared ran into difficulties and consequently filed for bankruptcy in May 2012.  (*Id.* ¶¶ 50–51.)  LightSquared's predicament had by this time caught the attention of Ergen, majority owner of DISH and chairman of its board, who had long been hoping to put DISH into the wireless broadband business and who therefore coveted the radio frequency spectrum licensed to LightSquared.  (*Id.* ¶¶ 22, 53.)  Under Ergen's direction, DISH had gone after other bankrupt or distressed companies' spectrum.  (*Id.* ¶ 54.)  In one instance, DISH acquired spectrum (that of a company named DBSD) through bankruptcy court machinations that the Second Circuit eventually found impermissible.  *See In re DBSD N. Am., Inc.*, 634 F.3d 79, 104–05 (2d Cir. 2011).  Harbinger claims that Ergen hatched another unlawful scheme to obtain a similar result through LightSquared's bankruptcy proceedings.  (ECF No. 1 ¶ 68.)

The details of this scheme are mostly irrelevant for present purposes.  The short of it is that Ergen wanted DISH to purchase a substantial portion of LightSquared's outstanding debt, thus permitting DISH to exert significant influence in the bankruptcy proceedings.  (*Id.* ¶¶ 5–7.)  Ergen learned, however, that LightSquared and its lenders were parties to a "Credit Agreement," contractually prohibiting lenders from selling debt to individuals or to competing businesses.  (*Id.* ¶ 65.)  DISH was considered a competitor, meaning that neither DISH nor Ergen personally (who possesses significant personal wealth) could purchase LightSquared's debt.  (*Id.* ¶¶ 65–67.)  Ergen therefore

enlisted Ketchum, an outside banker and friend, to have Ketchum's investment firm, Sound Point, set up SPSO and its sole member, SO Holdings.  (*Id.* ¶¶ 22, 69–70.) Ergen himself was the sole member of SO Holdings.  (*Id.* ¶ 22.)  SPSO then began purchasing large blocks of LightSquared debt, paying nearly $800 million and eventually becoming LightSquared's largest creditor.  (*Id.* ¶ 71.)

Ergen, through SPSO, allegedly used these debt purchases to disrupt LightSquared's ability to negotiate a reorganization plan with its creditors.  For example, SPSO would sometimes contract to buy LightSquared debt but would then delay closing those trades, making it difficult for LightSquared to determine the identity of its actual creditors—and therefore difficult to determine with whom it needed to negotiate. (*Id.* ¶¶ 117, 140, 144–47.)  However, perhaps most disruptive was a $2 billion bid for LightSquared's spectrum made in May 2013.  (*Id.* ¶ 87.)  This bid did not come through SPSO, but rather through LBAC, another entity Ergen formed to pursue LightSquared's spectrum.  (*Id.* ¶¶ 24, 96.)[1]

LBAC's $2 billion bid (nominally confidential but somehow leaked to the press) apparently gave LightSquared's creditors pause, given the opportunity to cash out rather than allow LightSquared to reorganize.  (*Id.* ¶¶ 96–97, 116.)  Ergen added to the pressure by having SPSO join the "Ad Hoc Secured Group," which was "an ad hoc group of lenders collectively possessing a majority of [LightSquared's debt]."  (*Id.* ¶¶ 10, 117.)  SPSO convinced the Ad Hoc Secured Group to support the LBAC bid rather than

---

[1] Around this time, Ergen disclosed that he was behind SPSO.  *LightSquared II*, 511 B.R. at 305.  Harbinger had already suspected as much, although its suspicions vacillated between Ergen and a few other wealthy individuals. *See id.* at 298–305.

continue reorganization discussions.  (*Id*. ¶ 119.)

**B.      The Special Committee Order**

Ergen's alleged scheme came to partial fruition in September 2013.  At that

point, "the Bankruptcy Court held a series of hearings related to whether Harbinger

should be able to dictate decisions related to LightSquared during the reorganization

proceedings and assessment of the [LBAC bid]."  (*Id*. ¶ 123.)  Allegedly "based on

[Defendants'] misrepresentations that the [LBAC bid] was adequate," the Bankruptcy

Court concluded that Harbinger was conflicted in its consideration of the bid (*i.e.*,

conflicted between its desire to protect its equity and its duty to make the best decision

for LightSquared).  The Bankruptcy Court therefore ordered the LightSquared board of

directors to form a special independent committee to handle "all actions and decisions

on behalf of LightSquared related to the [reorganization] plan process, an auction, or a

sale" ("Special Committee Order").  (*Id*. ¶¶ 124–25.)  This committee was fully formed

by September 27, 2013.  (*Id*. ¶ 125.)  At that point,

> Harbinger was stripped of its contractual rights under the
> Stockholders' Agreement, including its rights to appoint and
> remove the majority of directors, appoint committee
> members, chair committees, and dictate key management
> decisions.  Practically speaking, Harbinger lost the ability to
> participate in all material decisions related to LightSquared
> necessary to protect its investment.

(*Id*. ¶ 129.)

**C.      The Adversary Proceeding Complaint**

On September 30, 2013, Harbinger filed with the Bankruptcy Court an Adversary

Proceeding Complaint (actually an amended complaint, although that is irrelevant here)

against the same Defendants sued in this lawsuit, plus EchoStar Corporation ("EchoStar"), which Ergen also controls.  (*See* ECF No. 39-3.)  The Adversary Proceeding Complaint alleged the foregoing course of events in much greater detail and sought "redress for Defendants' fraud and other tortious conduct aimed at misappropriating Harbinger's control over and investment in LightSquared, and destroying Harbinger's contractual rights and business opportunities relating to that investment."  (*Id*. ¶ 1.)  Under this rubric, Harbinger asserted causes of action for:

- "equitable disallowance" of SPSO's claim, *i.e.*, invalidation of SPSO's ability to recover the value of any debt it purchased, given that Ergen, among other things, intentionally evaded the debt-buying restrictions through a front company;

- fraud, based on misrepresentation or intentional concealment of SPSO's ownership;

- aiding and abetting fraud, based on the same theory;

- tortious interference with prospective economic advantage, based on the notion that Defendants disrupted LightSquared's ability to reorganize;

- another count of tortious interference with prospective economic advantage, based on the notion that Defendants disrupted a particular opportunity to gain exit financing;

- unfair competition, based generally on all allegations;

- civil conspiracy, based on the same; and

- disallowance of SPSO's claim under 11 U.S.C. § 502(a).

(*Id*. ¶¶ 91–136.)

7

Defendants moved to dismiss for failure to state a claim and the Bankruptcy Court mostly granted those motions in its *LightSquared I* order.  The details of *LightSquared I* are not important here except the following:

First, the Bankruptcy Court fully understood that Harbinger rested its claims on the theory that, "as a result of the Ergen/DISH Defendants' 'fraudulent scheme,' [Harbinger] will lose its unique controlling interest in the Debtors and suffer billions of dollars in damages."  *LightSquared I*, 504 B.R. at 345.

Second, the Bankruptcy Court held that Harbinger's claims, if they existed at all, belonged to LightSquared and not Harbinger.  *See id*. at 351, 353, 356, 357, 358.

**D.      The Adversary Proceeding Trial**

Following *LightSquared I*, Harbinger filed a second amended complaint, asserting derivatively (on LightSquared's behalf) breach of contract and various disallowance claims.  (*See generally* ECF No. 39-4.)  These claims went to trial before the Bankruptcy Court, leading to its *LightSquared II* opinion.  Through the trial process, Harbinger learned that Ergen, before causing LBAC to bid $2 billion for LightSquared's spectrum, had valuation materials estimating "the total value of LightSquared's assets in DISH's hands . . . to be between $5.174 billion and $8.996 billion, with a midpoint of $7.085 billion."  *LightSquared II*, 511 B.R. at 292.  Another valuation available to Ergen posited a range of $4.4 billion to $13.3 billion.  *Id*.

Harbinger also heard lengthy testimony from Ergen, Ketchum, and others about the supposedly valid economic reasons for SPSO to delay closing certain debt trades. *Id*. at 305–11.  The Bankruptcy Court did not find this testimony credible.  *Id*.  The

Bankruptcy Court concluded that SPSO's choice to hold debt trades open, among other things, had harmed LightSquared's ability to pursue reorganization plans. *Id*. at 353–61.

Ultimately, the Bankruptcy Court found that SPSO had breached the implied covenant of good faith and fair dealing through its concealment of Ergen as its actual owner. *Id*. at 333–39. The Bankruptcy Court was obviously displeased with Ergen's and SPSO's behavior:

> SPSO has gone to great lengths to identify the many things it did that are "perfectly lawful" and just plain "smart" . . . . But its otherwise lawful pursuit of aggressive and profitable distressed debt transactions does not entitle it to do what it did to the LightSquared estates and cases. As Mr. Ergen so colorfully explained during Trial, "[y]ou can live in a bubble if you want to . . . and probably never get any disease. But you go play in the mud and the dirt and you probably aren't going to get disease either because you get immune to it. So you pick your poison and I think we choose to go play in the mud." Here, playing in the mud involved end-running the LightSquared Credit Agreement and then purposefully holding in limbo hundreds of millions of dollars of debt trades and undermining the ability of the Debtors, the constituents, and even the Court to conduct the case.

*Id*. at 361 (footnote omitted; alteration in original). As LightSquared's remedy, the Bankruptcy Court ordered that SPSO's claim be subordinated to other creditors' claims in an amount to be determined later. *Id*.

## E.     This Action

Apparently not satisfied with that outcome, Harbinger then filed this lawsuit. Harbinger's complaint (ECF No. 1) alleges substantially all of the foregoing and contains essentially all of the information alleged in its Adversary Proceeding

Complaint, but with somewhat different emphases.  For example, Harbinger repeatedly emphasizes that it is not suing for the lost value of its equity investment in LightSquared, but rather for the loss of the Stockholders' Agreement control rights, which allegedly "represent a significant premium independent of, and incremental to, the value of Harbinger's equity alone."  (ECF No. 1 ¶ 4; *see also id*. ¶¶ 9, 115, 123, 129, 149–51.)  In other words, Harbinger is suing because the Bankruptcy Court entered the Special Committee Order.

To shore up that claim, Harbinger's current complaint also emphasizes that Defendants convinced the Bankruptcy Court to enter the Special Committee Order by representing that the $2 billion was "fair," which was—allegedly— a knowing misrepresentation in light of Defendants' in-house valuations that valued LightSquared's spectrum well above $2 billion.  (*Id*. ¶¶ 105–14.)  Had the Bankruptcy Court known that $2 billion was not a fair bid, says Harbinger, the Bankruptcy Court would have seen that Harbinger had no reason to take the bid seriously and therefore would not have entered the Special Committee Order.  (*Id*. ¶¶ 10, 88, 105, 111.)

Finally, Harbinger emphasizes Defendants' use of electronic and postal communications to execute their strategies.  Such emphasis leads to their first cause of action, a civil RICO claim predicated on alleged wire fraud, mail fraud, bankruptcy fraud, and obstruction of justice.  (ECF No. 1 ¶¶ 152–67.)  Harbinger alleges that "[t]he common purpose of the Defendants' actions in furtherance of the RICO Enterprise was to use artifice, deceit, misinformation, and dishonest means to wrest away from LightSquared the valuable wireless spectrum assets held by LightSquared while in bankruptcy, and strip Harbinger of the valuable rights it held pursuant to the

10

Stockholders' Agreement." (*Id*. ¶ 155.)

Based on the same premises, Harbinger next asserts causes of action for civil RICO conspiracy, violations of the Colorado Organized Crime Control Act ("COCCA," which is Colorado's equivalent to RICO), and COCCA conspiracy. (*Id*. ¶¶ 168–210.) Harbinger also asserts a tortious interference with contract claim, arguing that Defendants' actions in securing the Special Committee Order interfered with Harbinger's contractual relations under the Stockholders' Agreement. (*Id*. ¶¶ 168–210.) Finally, Harbinger asserts a claim for abuse of process based on "repeated misrepresentations and omissions to the Bankruptcy Court." (*Id*. ¶¶ 218–25.)

Harbinger explains that it is suing in Colorado rather than New York because this is "where one or more of the Defendants reside [*i.e.*, Ergen] and because this is the district where a substantial amount of the activities forming the basis of the Complaint occurred . . . ." (*Id*. ¶ 30.)

## F.   LightSquared's Current Status

Although the parties have said nothing about it to this Court, the Court notes that the Bankruptcy Court approved a reorganization plan for LightSquared last month. (*See* Case No. 12-12080-scc, ECF No. 2276 & 2276-1 (Bankr. S.D.N.Y., filed Mar. 27, 2015) (collectively, "Reorg. Plan").) That plan requires, among other things, that Harbinger assign the "Harbinger Litigations" to LightSquared. (Reorg. Plan, ECF No. 2276 at 45, 59–60, 84.) "Harbinger Litigations" is defined to include "the RICO Action," meaning this lawsuit. (*Id*., ECF No. 2276-1 at 19, 34.)

Again, the parties have said nothing to the Court on this score.  The Court will therefore assume that nothing has changed in a manner that might affect the outcome here.

## III.  ANALYSIS

Defendants challenge Harbinger's claims on numerous grounds.  (*See generally* ECF No. 39.)  The Court finds that Defendants' arguments regarding claim-splitting and collateral attacks are persuasive and dispositive, and the Court does not reach Defendants' remaining arguments for dismissal.

### A.      Claim-Splitting

#### 1.      <u>Claim-Splitting Generally</u>

"The rule against claim-splitting requires a plaintiff to assert all of its causes of action arising from a common set of facts in one lawsuit."  *Katz v. Gerardi*, 655 F.3d 1212, 1217 (10th Cir. 2011).  Applying the claim-splitting prohibition is ultimately a matter of a district court's "discretion to control [its] docket[] by dismissing duplicative cases."  *Id*.  Rather than continually repeating unwieldy phrases like "the rule against claim-splitting" or "the claim-splitting prohibition," the Court will refer to this doctrine simply as "claim-splitting."

Claim-splitting is not the same as claim preclusion (*res judicata*).  Claim preclusion applies when another case has reached final judgment, whereas claim-splitting applies when the other case is ongoing.  *Id*. at 1217–18.  "[T]he test for claim splitting is not whether there is finality of judgment, but whether the first suit, assuming it

were final, would preclude the second suit." *Id*. at 1218.[2]  Thus, although claim-splitting

differs from claim preclusion, claim-splitting draws on the law of claim preclusion when

deciding whether the second suit should be dismissed.

Normally a claim-splitting analysis requires determining which jurisdiction's claim

preclusion law should apply.  *See, e.g.*, *Hartsel Springs Ranch of Colo., Inc. v.*

*Bluegreen Corp.*, 296 F.3d 982, 986 (10th Cir. 2002).  Neither Harbinger nor

Defendants offer this Court any guidance on that point, which is unfortunate in light of

the fact that Harbinger asserted both state and federal theories in the Adversary

Proceeding, and does the same here.  *Cf. id*. (applying state claim preclusion law to

determine effect of federal court diversity judgment).

Fortunately, all of the potentially relevant jurisdictions—federal, Colorado, and

New York (under whose law Harbinger asserted certain causes of action in its

Adversary Proceeding Complaint)—follow substantially the same principles.  *See*

*MACTEC, Inc. v. Gorelick*, 427 F.3d 821, 831 (10th Cir. 2005) ("claim preclusion applies

when three elements exist: (1) a final judgment on the merits in an earlier action;

(2) identity of the parties in the two suits; and (3) identity of the cause of action in both

suits"); *Cruz v. Benine*, 984 P.2d 1173, 1176 (Colo. 1999) ("[Claim preclusion] requires

the presence of four elements: (1) finality of the first judgment, (2) identity of subject

matter, (3) identity of claims for relief, and (4) identity or privity between parties to the

actions."); *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 894 N.E.2d 1, 12 (N.Y.

2008) ("claim preclusion[] bars successive litigation based upon the same transaction or

---

[2] No party argues that a final judgment exists here.

series of connected transactions if: (i) there is a judgment on the merits rendered by a court of competent jurisdiction, and (ii) the party against whom the doctrine is invoked was a party to the previous action, or in privity with a party who was" (citations and internal quotation marks omitted)).

Importantly, each of these jurisdictions agrees that claim preclusion extends both to matters actually raised and matters that could have been raised in the earlier action. *Wilkes v. Wyo. Dep't of Emp't*, 314 F.3d 501, 503–04 (10th Cir. 2002) (claim preclusion applies to "issues that were or *could have been raised* in the prior action" (emphasis in original)); *Cruz*, 984 P.2d at 1176 ("Notably, the doctrine not only bars litigation of issues actually decided, but also any issues that could have been raised in the first proceeding but were not."); *O'Brien v. City of Syracuse*, 429 N.E.2d 1158, 1159 (N.Y. 1981) ("once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy").

With these principles apparently in mind, Harbinger asserts four general rebuttals to Defendants' claim-splitting challenge: (1) the Bankruptcy Court would not have had jurisdiction over the claims asserted here; (2) the Amended Complaint was dismissed for lack of standing and such dismissal has no preclusive effect; (3) the claims are different than those in the Adversary Proceeding; and (4) the parties are different than those in the Adversary Proceeding.  (ECF No. 52 at 16–20.)  The Court addresses each argument in turn.

2.    Jurisdiction

Claim preclusion generally does not apply—and therefore claim-splitting would

14

not apply—where the first court would have lacked subject matter jurisdiction over the claims asserted in the second court. *See* Restatement (Second) of Judgments § 26(1)(c) (1982). Harbinger argues that it asserts "non-core claims" over which the Bankruptcy Court could not exercise jurisdiction. (ECF No. 52 at 17.) Non-core claims are those "which do not depend on the bankruptcy laws for their existence and which could proceed in another court." *In re Gardner*, 913 F.2d 1515, 1518 (10th Cir. 1990).

Harbinger's claims in this lawsuit do not depend on the bankruptcy laws for their existence, but that does not mean that the Bankruptcy Court lacked jurisdiction or that claim-splitting cannot apply. Congress explicitly granted bankruptcy courts jurisdiction to "hear a [non-core] proceeding . . . that is otherwise related to a case under title 11." 28 U.S.C. § 157(c)(1). Absent consent of the parties, a bankruptcy court may not enter final judgment on a non-core proceeding. *See id.* ("In such proceeding, the bankruptcy judge shall submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge . . . ."); *see also id.* § 157(c)(2) (allowing parties to consent to plenary bankruptcy jurisdiction). But the Bankruptcy Court's inability to enter final judgment absent consent did not deprive it of subject matter jurisdiction to hear the claims Harbinger now asserts.[3]

---

[3] Harbinger also invokes RICO in the context of 28 U.S.C. § 157(d), which states in relevant part: "The district court shall, on timely motion of a party, . . . withdraw a proceeding [from the bankruptcy court over which it presides] if the [district] court determines that resolution of the proceeding requires consideration of both [the Bankruptcy Code] and other laws of the United States regulating organizations or activities affecting interstate commerce." (*See* ECF No. 52 at 17 & n.9.) Contrary to Harbinger's assertion, however, this does not mean that RICO is "a federal law statutorily beyond the Bankruptcy Court's jurisdiction." (*Id.*) If 28 U.S.C. § 157(d) established a jurisdictional prohibition, then it would not turn on the filing of a "timely motion." *See, e.g.*, *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("[N]o action of the parties can confer subject-matter jurisdiction upon a federal court. Thus, the consent of the parties is irrelevant, principles of estoppel do not apply, and a

Further, the Tenth Circuit has already determined that non-core claims which could have been asserted in Chapter 11 proceedings are subject to claim preclusion principles.  In *Plotner v. AT&T Corp.*, 224 F.3d 1161 (10th Cir. 2000), the debtor's major asset in Chapter 11 proceedings was a parcel of land next to an AT&T facility.  *Id*. at 1164.  AT&T contracted to buy that parcel.  *Id*. at 1165.  The debtor moved in the bankruptcy court to have the sale rejected but the bankruptcy court denied that motion.  *Id*.  Some time later, the debtor filed an adversary proceeding against AT&T and related parties alleging fraud and similar causes of action arising out of AT&T's purchase.  *Id*. at 1166.  Both the bankruptcy court and district court held that claim preclusion barred the adversary proceeding in light of the earlier challenge to the sale.  *Id*. at 1166–67.

On appeal to the Tenth Circuit, the debtor argued a position taken by the Fifth and Seventh Circuits, both of which reasoned that "non-core proceedings in bankruptcy cannot be given [claim preclusive] effect, because under 28 U.S.C. § 157 bankruptcy courts cannot hear non-core proceedings absent consent of the parties without being subject to de novo review by the district court."  *Id*. at 1173 (citing *Barnett v. Stern*, 909 F.2d 973, 978–79 (7th Cir. 1990); and *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 189–90 (5th Cir. 1990)).  The Tenth Circuit, however, rejected this reasoning and instead agreed with the Second, Sixth, and Ninth Circuits that the bankruptcy court's power to hear non-core claims suffices for claim preclusion purposes.  *Id*. (citing *In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969–70 (9th Cir. 1994); *Sanders Confectionery Prods., Inc. v. Heller Fin., Inc.*, 973 F.2d 474, 483 (6th Cir. 1992); and *Sure-Snap Corp. v. State*

party does not waive the requirement by failing to challenge jurisdiction early in the proceedings." (citations omitted)).

16

*Street Bank & Trust Co.*, 948 F.2d 869, 873–77 (2d Cir. 1991)).  Thus, the debtor's

claim "*could have been asserted* at the time of the proceeding confirming sale, and this

opportunity is sufficient to satisfy that requirement of the doctrine of [claim preclusion]."

*Id*. (citations and internal quotation marks omitted; emphasis in original).

Thus, in both this Circuit and the Second Circuit (where Harbinger filed the

Adversary Proceeding), claim preclusion applies to non-core claims that could have

been asserted before the Bankruptcy Court.  Accordingly, the Court rejects Harbinger's

argument that the Bankruptcy Court lacked jurisdiction to hear the claims Harbinger

now asserts.

    3.   <u>Standing</u>

Harbinger also argues that its Adversary Proceeding complaint "was dismissed

on standing grounds in *LightSquared I*," meaning that "the Bankruptcy Court lacked

subject matter jurisdiction over those claims and therefore that decision has no

preclusive effect."  (ECF No. 52 at 17.)  The Bankruptcy Court never stated explicitly in

*LightSquared I* that it was dismissing on standing grounds, but it did state on several

occasions that Harbinger's claims were dismissed without prejudice to LightSquared

itself raising those claims.  *See* 504 B.R. at 351, 353, 356, 357, 358.

Regardless, dismissal for lack of standing does help not Harbinger in this

instance.  Harbinger forgets that claim preclusion (and therefore claim-splitting) extends

to claims that could have been brought in the prior proceeding.  *See* Section III.A.1,

*supra*.  Simply because the Bankruptcy Court dismissed certain claims that Harbinger

could not bring in its own name does not mean that Harbinger was precluded from

asserting proper first-party claims, if any.  Thus, Harbinger's standing argument has no bearing on the claim-splitting analysis.

     4.   <u>Identity of Claims</u>

Harbinger next asserts that the Adversary Proceeding Complaint and its current complaint "arise from different transactions and seek entirely different relief based on violations of different rights."  (ECF No. 52 at 18.)  This argument is meritless.  The following table compares Harbinger's Adversary Proceeding Complaint and its current complaint:

| Allegation | Adversary Proceeding Complaint ¶¶ (ECF No. 39-3) | Current Complaint ¶¶ (ECF No. 1) |
| --- | --- | --- |
| Harbinger's investment in LightSquared and LightSquared's descent into bankruptcy. | 29–33 | 44–45, 49–51 |
| Importance of the Stockholders' Agreement to Harbinger's investment. | 1, 70 | 46–49 |
| Formation of SPSO to evade disqualification of DISH and Ergen as debt buyers. | 36–51 | 64–71 |
| Use of "SP" in SPSO to suggest Sound Point ownership, thus deflecting suspicion from DISH and Ergen. | 37 | 69 |
| Convincing LightSquared and affiliated parties, through false information, that SPSO is qualified to purchase LightSquared's debt. | 52–59 | 72–75 |
| Ketchum's, Sound Point's, and SPSO's importance as a front for executing the debt-buying scheme. | 61–62 | 82 |
| SPSO's unusual delay in closing large debt trades, thus hindering LightSquared/Harbinger's ability to determine with whom it needed to negotiate a reorganization plan. | 64–67 | 117, 140, 144–47 |

| Allegation | Adversary Proceeding Complaint ¶¶ (ECF No. 39-3) | Current Complaint ¶¶ (ECF No. 1) |
|---|---|---|
| LBAC's knowingly low $2 billion bid for LightSquared's spectrum, leaked to the press to disrupt plans for consensual reorganization. | 74–78 | 87–88, 96–97, 105–10, 115–16 |
| SPSO's reorganization plan, favorable to SPSO, on behalf of the Ad Hoc Secured Group. | 79–81 | 119 |
| DISH board's independent committee evaluation of Ergen's actions toward LightSquared. | 82 | 99–101 |
| Ergen's actions toward DBSD and similar distressed companies. | 83–87 | 53–61, 130 |
| Harbinger prevented by Defendants' actions from exercising control and guiding LightSquared to a reorganization that keeps Harbinger's equity intact. | 1, 88–90 | 115, 123, 129, 149–51 |

In short, all of the material allegations from the Adversary Proceeding (and many of the subsidiary allegations) are a part of this proceeding as well.  This more than satisfies the Tenth Circuit's "transactional approach . . . in determining what constitutes identity of the causes of action.  The transactional approach provides that a claim arising out of the same transaction, or series of connected transactions as a previous suit, which concluded in a valid and final judgment, will be precluded."  *Yapp v. Excel Corp.*, 186 F.3d 1222, 1227 (10th Cir. 1999) (citations and internal quotation marks omitted).

Harbinger's current complaint certainly places more rhetorical emphasis on Defendants' alleged intent to undermine Harbinger's control rights granted in the Stockholders' Agreement.  (*See, e.g.*, ECF No. 1 ¶¶ 4, 9, 115, 123, 129, 149–51.)  But this allegation is simply an elaboration on Harbinger's claim in the Adversary

Proceeding that "Defendants' fraud and other tortious conduct [is] aimed at misappropriating Harbinger's control over and investment in LightSquared, and destroying Harbinger's contractual rights and business opportunities relating to that investment."  (ECF No. 39-3 ¶ 1; *see also id*. ¶¶ 70, 88–90.)

Harbinger nonetheless persists, arguing that its current complaint, in supposed contrast to the Adversary Proceeding Complaint, "encompasses a pattern of wrongful conduct stretching back to Defendants' acts in the DBSD bankruptcy proceedings in 2009 and seeks damages for the acts which caused the appointment of the Special Committee and the extinguishment of Harbinger's contractual rights."  (ECF No. 52 at 19.)  This argument is frivolous.  Harbinger's Adversary Proceeding Complaint explicitly raised DISH/Ergen's actions toward DBSD as part of an alleged "longstanding history of abusing the bankruptcy process" (ECF No. 39-3 ¶¶ 83–84), and the Bankruptcy Court addressed this specific claim, *see LightSquared I*, 504 B.R. at 354 (finding allegations concerning DBSD "not dispositive . . . and . . . perhaps not even relevant to this case").  Accordingly, Harbinger has no good faith basis for alleging that allegations regarding DBSD make its current complaint different from the Adversary Proceeding Complaint.

As for "the acts which caused the appointment of the Special Committee and the extinguishment of Harbinger's contractual rights" (ECF No. 52 at 19), Harbinger knew of these acts before it filed its Adversary Proceeding Complaint.  Indeed, it alleges in its current complaint that the independent committee was ordered into existence (*i.e.*, by the Special Committee Order) sometime in September 2013 and was fully formed by September 27, 2013.  (ECF No. 1 ¶¶ 121–25.)  Harbinger filed its Adversary Proceeding Complaint on September 30, 2013.  (ECF No. 39-3.)

Harbinger claims, however, that it did not then know all of the alleged fraud that attended the Special Committee Order.  (ECF No. 52 at 19.)  Harbinger particularly emphasizes the later revelation that Ergen had materials valuing LightSquared's spectrum much higher than LBAC's actual bid of $2 billion.  (*See, e.g.*, ECF No. 1 ¶¶ 10, 88, 105.)  *See also LightSquared II*, 511 B.R. at 291–92 (discussing valuations available to Ergen).  Harbinger therefore argues that Defendants procured the Bankruptcy Court's Special Committee Order by falsely representing that $2 billion was a "fair" bid—the implication being that the Bankruptcy Court would never have found Harbinger to have a conflict of interest if the Bankruptcy Court had known that the LBAC bid was too low to be taken seriously.  (ECF No. 1 ¶¶ 10, 88, 105, 111; ECF No. 52 at 10–11, 19.)  This argument fails for numerous reasons.

First, despite an eight-page table setting forth in detail Defendants' allegedly false representations (ECF No. 1 at 68–75), Harbinger nowhere alleges exactly where or when this allegedly false representation of fairness took place.

Second, Harbinger does not favor this Court with any discussion of what a "fair" bid means in the bankruptcy context.  In everyday life, parties regularly bid low, sometimes laughably low.  That does not make such bids unfair.  If the bankruptcy context requires a different standard, either as to the substance of the bid or representations to a bankruptcy court about it, Harbinger has not explained what that standard might be.

Third, Harbinger here alleges that it always knew the LBAC bid was "too low to warrant serious consideration."  (ECF No. 1 ¶ 90.)  Presumably Harbinger argued as much to the Bankruptcy Court in response to the motion practice that led to the Special

Committee Order—or at least it could have argued as much. Harbinger therefore either lost on that issue or waived it.

Finally, and most seriously, if Defendants in fact procured the Special Committee Order through fraudulent misrepresentations to the Bankruptcy Court, Harbinger must raise that with the Bankruptcy Court. *See* Fed. R. Civ. P. 60(b)(3) (orders may be withdrawn due to an opposing party's fraud on the court); *Plotner*, 224 F.3d at 1170 (noting lack of authority "for the proposition that fraud on the court is an authority to allow a *collateral* attack on a judgment—i.e., defeating the defense of [claim preclusion]—particularly considering that Fed. R. Civ. P. 60(b) provides for consideration of fraud on the court as grounds for direct attack—i.e., obtaining relief from the court that issued the original judgment" (emphasis in original)).[4]  Harbinger has had every opportunity to do so.  Defendants' supposedly concealed valuations were part of the evidence in a trial the Bankruptcy Court held last year, and the Bankruptcy Court thoroughly considered those valuations. *See LightSquared II*, 511 B.R. at 291–92.  If Harbinger has a claim based on them, Harbinger must bring that claim before the Bankruptcy Court.[5]

---

[4] Rule 60(b) applies in bankruptcy proceedings. *See* Fed. R. Bankr. P. 9024.

[5] Harbinger raises a number of other post-Special Committee Order actions that supposedly caused "new injuries," including "Ergen, Kiser [a DISH employee], and Ketchum repeatedly lying under oath in the Adversary Proceeding to conceal their bad acts from the Bankruptcy Court," "Defendants falsely accusing [Harbinger principal Philip] Falcone of wrongdoing," and "Harbinger being forced to resign from LightSquared's board."  (ECF No. 52 at 19.)  If Ergen and others lied under oath, that is for the Bankruptcy Court to deal with—and to some extent it has, having found these witnesses non-credible in certain instances. *LightSquared II*, 511 B.R. at 289 (Ergen), 308 (Ketchum), 310 (Kiser).  As for falsely accusing Falcone, Harbinger admits that the Bankruptcy Court refused to take action based on those false accusations.  (ECF No. 1 ¶ 136.)  Finally, assuming *arguendo* that loss of control rights could otherwise state a claim, being forced to resign from LightSquared's board changes

In all events, the Court finds that the claims asserted here are claims that could have been brought in the Adversary Proceeding Complaint.

5.    Identity of Parties

The plaintiffs and defendants in the Adversary Proceeding are exactly the same as the plaintiffs and defendants in this proceeding, except that Harbinger sued EchoStar in the Adversary Proceeding but not here.  (*Compare* ECF No. 39-3 at 1–2 (caption) *with* ECF No. 1 at 1 (caption).)  It would thus seem beyond question that identity of parties exists here.

Harbinger, however, attempts to evade this conclusion by arguing that "there is no identity of parties between this instant action *and the SAC that went to trial*" (ECF No. 52 at 20 (emphasis added))—referring to Harbinger's second amended complaint, *i.e.*, the complaint it filed after the Bankruptcy Court dismissed the Adversary Proceeding Complaint for failure to state a claim.  Harbinger emphasizes that, under its second amended complaint, it acted in a derivative capacity (on LightSquared's behalf) solely against SPSO.  (*Id.*)

The Court does not see the relevance of this distinction.  As against the parties present here, Harbinger could have brought these claims in the Adversary Proceeding. Identity of parties therefore indisputably exists.

For all these reasons, the Court holds that all of Harbinger's current causes of action are prohibited by the rule against claim-splitting, and will be dismissed on that basis.

---

nothing.  Given the Special Committee Order, Harbinger had no control anyway.

**B.      Collateral Attack**

Closely related to the foregoing is the prohibition on collateral attacks.  "A 'collateral attack' is a tactic whereby a party seeks to circumvent an earlier ruling of one court by filing a subsequent action in another court."  *Pratt v. Ventas, Inc.*, 365 F.3d 514, 519 (6th Cir. 2004).  Harbinger insists this action is not a collateral attack "because Harbinger seeks monetary damages flowing from Defendants' continuing misconduct that led to the extinguishment of its contractual rights."  (ECF No. 52 at 21.)  Harbinger further states that it "makes no attempt to undermine the validity of the Bankruptcy Court's order."  (*Id*. at n.18.)

To the contrary, "[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment."  *Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972).  Here, the immediate cause of the harm of which Harbinger complains is the Special Committee Order—*that* is the reason Harbinger lost its control rights.  Thus, to succeed in this lawsuit on any theory, Harbinger would need to prove that the Special Committee Order was improperly obtained.[6]  Harbinger necessarily

---

[6] If Harbinger could sue based on the effect of a *proper* court order, the legal system would fall into a feedback loop.  A winning party could obtain a judgment and then the losing party could sue the winning party for the "damages" incurred by having to pay that judgment, *ad infinitum*.

attacks "the validity of the Bankruptcy Court's order."  (ECF No. 52 at 21 n.18.)[7]

Harbinger may not do so in this Court.  *See Celotex Corp. v. Edwards*, 514 U.S. 300,

313 (1995) ("If respondents believed the [Bankruptcy Court's order] was improper, they

should have challenged it in the Bankruptcy Court . . . .  Respondents chose not to

pursue this course of action, but instead to collaterally attack the Bankruptcy Court's

[order] in [other] federal courts . . . . This they cannot be permitted to do without

seriously undercutting the orderly process of the law.").  Harbinger's complaint will be

dismissed as an impermissible collateral attack.

### IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.      Defendants' Motion to Dismiss the Complaint (ECF No. 39) is GRANTED.  This

dismissal is without prejudice to Harbinger re-filing its claims in an appropriate

forum.

2.      The Clerk SHALL TERMINATE this case.


Dated this 28th day of April, 2015.

BY THE COURT:

_____

William J. Martinez
United States District Judge

---

[7] This is analogous to a prisoner who files a 42 U.S.C. § 1983 action for damages based
on constitutional violations that allegedly led to his or her arrest and conviction.  The prisoner
cannot simply rest on the claim that he or she only seeks damages, not release from prison.
The nub of the prisoner's complaint goes to the lawfulness of the conviction.  The prisoner must
therefore have his or her conviction overturned before pursuing such damages. *Heck v.
Humphrey*, 512 U.S. 477, 485–87 (1994).

25